UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:                                             Case No. 22-19571-LMI

RC HOME SHOWCASE, INC.,                            Chapter 11

       Debtor.

_____/

## MOTION TO PROHIBIT OR CONDITION USE OF CASH COLLATERAL AND FOR ADEQUATE PROTECTION

Secured creditor, Manuhen Enterprises, LLC ("Manuhen"), by counsel, pursuant to 11 U.S.C. § 363(e), requests the Court enter an order: (a) prohibiting or otherwise conditioning the use of cash collateral, as set forth below; and (b) providing for adequate protection, and states as follows:

### *Factual Background*

1.     This case was commenced by the filing of a voluntary Chapter 11 petition on December 15, 2022 (the "Petition Date") by RC Home Showcase, Inc. (the "Debtor").

2.     Manuhen previously owned a 100% interest in the Debtor.

3.     On or around December 22, 2020, Manuhen, the Debtor and BES Associates, Corp. ("BES") entered into an Amended Stock Purchase Agreement (the "Amended SPA"), whereby Manuhen sold all of its shares of stock in the Debtor to BES, for the purchase price of $4,270,000.00 (the "Purchase Price"). A true and correct copy of the Amended SPA is attached hereto as Exhibit "A".

4.     Upon information and belief, BES is owned by Eusebio Paredes ("Paredes"), who is also the principal of the Debtor[1].

5.     The Purchase Price was comprised of: (a) cash in the amount of $400,000.00; (b) a promissory note in the amount of $2,970,000.00 (the "Balloon Note"), in favor of Manuhen; and (c) a promissory note in the amount of $900,000.00 (the "Term Note"), in favor of Manuhen.

---

[1] In addition, despite the fact that the ownership interest in the Debtor was sold by Manuhen to BES, the Debtor's List of Equity Security Holders [ECF No. 3] lists Paredes as the 100% owner of the Debtor.

### *The Underlying Promissory Notes and Security Agreements*

6.      In connection with the Amended SPA, on January 13, 2021, the Debtor and BES executed and delivered a Promissory Note (the Balloon Note referenced above), to Manuhen, in the amount of $2,970,000.00, at the rate of 4% per annum, amortized over 25 years, and payable in 11 consecutive monthly installments of $15,676.75 each, commencing on February 12, 2021, with a final payment of the unpaid outstanding principal and interest due on January 12, 2022. Default interest would accrue at the rate of 18% per annum.  A true and correct copy of the Balloon Note is attached hereto as Exhibit "B".

7.      On January 13, 2021, the Debtor and BES also executed and delivered a Security Agreement (the "First Security Agreement"), in connection with the Balloon Note, whereby the Debtor and BES granted Manuhen a first and continuing security interest in essentially all of the assets of both the Debtor and BES (the "Collateral")[2].  Such Collateral includes, without limitation, money, negotiable instruments, documents of title, securities and deposit accounts.  A true and correct copy of the First Security Agreement is attached hereto as Exhibit "C".

8.      Paredes guaranteed the obligations owed to Manuhen under the Balloon Note, pursuant to an Unconditional and Irrevocable Guaranty of Payment, a true and correct copy of which is attached hereto as Exhibit "D".  A true and correct copy of the UCC-1 Financing Statement, filed in connection with the First Security Agreement, is attached hereto as Exhibit "E".

9.      In addition, on January 13, 2021, the Debtor and BES executed and delivered a Promissory Note (the Term Note referenced above), to Manuhen, in the amount of $900,000.00, at the rate of 4% per annum, payable in 60 consecutive monthly installments of $16,574.87 each, commencing on March 14, 2021, with a final payment of the unpaid outstanding principal and interest due on March 14, 2026.  Default interest would accrue at the rate of 18% per annum.  A true and correct copy of the Term Note is attached hereto as Exhibit "F".

10.     On January 13, 2021, the Debtor and BES also executed and delivered a Security

---

[2] The Collateral is more specifically described in Exhibit "A" to the First Security Agreement.

Agreement (the "Second Security Agreement"), in connection with the Term Note, whereby the Debtor and BES granted Manuhen a first and continuing security interest in the Collateral. A true and correct copy of the First Security Agreement is attached hereto as Exhibit "G".

11.    Paredes guaranteed the obligations owed to Manuhen under the Term Note, pursuant to an Unconditional and Irrevocable Guaranty of Payment, a true and correct copy of which is attached hereto as Exhibit "H". A true and correct copy of the UCC-1 Financing Statement, filed in connection with the Second Security Agreement, is attached hereto as Exhibit "I".

### *The Debtor's Pre-Petition Default*

12.    The Debtor failed to make certain payment(s) due under the Balloon Note and the Term Note.

13.    As such, on September 14, 2021, Manuhen commenced a lawsuit against the Debtor, BES and Paredes, for damages under the Balloon Note and Term Note, for the foreclosure of its security interest in the Collateral and for breach of the guaranties by Paredes. The lawsuit also included a count for breach of a subsequent (unsecured) agreement between Manuhen and the Debtor, whereby the Debtor was obligated to pay Manuhen an additional $176,000.00. The lawsuit is styled *Manuhen Enterprises, LLC v. RC Home Showcase, Inc., et al.*, Case No. 21-021100-CA-01, pending in the Circuit Court for the 11th Judicial Circuit, in and for Miami-Dade County, Florida (the "State Court Lawsuit").

14.    On November 1, 2021, the Debtor, BES and Paredes filed a Counterclaim in the State Court Lawsuit, asserting fraud in the inducement and requesting rescission of the above-referenced documents. Manuhen has denied the claims set forth in the Counterclaim.

15.    Although the State Court Lawsuit was stayed as to the Debtor upon the Petition Date, it is continuing with respect to BES and Paredes.

### The Debtor's Bankruptcy Filing

16.     Pursuant to the First Security Agreement and the Second Security Agreement, as the Collateral includes, without limitation, money, negotiable instruments, documents of title, securities and deposit accounts, Manuhen has a lien on "cash collateral", as that term is defined in 11 U.S.C. § 363(a) (the "Cash Collateral").

17.     The Debtor filed its initial schedules on December 29, 2022 [ECF No. 25] (the "Schedules").  The Schedules reflected:

a.   Bank accounts having a value of only $5,351.78;

b.   Office furniture, fixtures and equipment having a value of only $10,000.00; and

c.   Machinery, equipment and vehicles having a value of only $175,150.00.

18.     On February 23, 2023, Manuhen filed Claim No. 16-1, in the amount of $5,510,630.59, which includes a secured claim in the amount of $5,347,062.31[3].

19.     Having previously owned the Debtor and being familiar with the value of its assets, Manuhen believes that the Debtor either: (a) substantially undervalued its assets, and in particular, Manuhen's Collateral; or (b) disposed of Manuhen's Collateral, either prior to or after the Petition Date.  For example, the Debtor owned substantial inventory, including glass inventory at its business premises; however, on the Schedules, the Debtor indicated that it did not own *any* inventory.

20.     Furthermore, upon information and belief, the Debtor is the owner of numerous Notices of Acceptance ("NOAs"), which are product approvals issued by Miami-Dade County, Florida.  These NOAs have substantial value and were not disclosed in the Schedules.

21.     Since the Debtor allegedly either disposed of or undervalued its assets, Manuhen does not have knowledge regarding whether it is an under-secured or over-secured creditor in this proceeding.

22.     At the § 341 Meeting of Creditors held on January 20, 2023, Manuhen, through

---

[3] The unsecured portion of Manuhen's claim includes the subsequent unsecured loan agreement referenced above.

counsel, advised the Debtor, through Paredes, that it had a lien on the Collateral and inquired about the filing of a motion to use cash collateral, pursuant to 11 U.S.C. § 363(c).

23.     Thereafter, undersigned counsel and the Debtor's counsel began informal discussions regarding the appropriate adequate protection payments that the Debtor would be making to Manuhen.  However, to date, those discussions were never completed, and the Debtor continues to use Manuhen's Cash Collateral, without its consent, despite the fact that almost three (3) months have passed since the Petition Date.

24.     In addition, upon information and belief, on or around February 28, 2023, the Debtor moved from its prior business premises, located at 16115 NW 52 Ave, Hialeah, FL 33014, to another business location, the address of which is unknown to Manuhen[4].

25.     Manuhen is in the dark as to the whereabouts or the location of its Collateral and is concerned about the sale or dissipation of the Debtor's assets, including the Collateral, given its move from its initial location to its new (and undisclosed) location.  Manuhen, through counsel, has requested that the Debtor arrange for an informal inspection of Manuhen's Collateral; however, the Debtor has not committed to agreeing to an informal inspection.  As such, contemporaneously herewith, Manuhen is serving on the Debtor a request to inspect its new business premises, including any and all of Manuhen's Collateral.

*Relief Requested*

26.     By this Motion, Manuhen seeks the entry of an order:

a.     Prohibiting the use of the Cash Collateral, pursuant to 11 U.S.C. § 363(e), or alternatively, conditioning the use of the Cash Collateral, on:

i.     The payment of an appropriate monthly adequate protection payment to Manuhen during the pendency of this bankruptcy proceeding;

ii.     The filing of a cash budget, which indicates that the Debtor is operating on

---

[4] Earlier in this case, the Court heard disputes between the Debtor and its former landlord, the result of which is that the Debtor moved to a new location.

a cash flow-positive basis, including the contemplated adequate protection

payment to Manuhen;

    iii.  An inspection of the Debtor's new business premises within 7 days from

the date of the entry of an order granting this Motion, and confirmation that

none of Manuhen's Collateral has been sold or disposed of;

    iv.  Replacement liens in accordance with applicable law; and

    v.  Any other relief resulting in the realization of the "indubitable equivalent"

of Manuhen's interest in the Debtor's assets.

    b.  Providing for adequate protection in favor of Manuhen, as set forth above.

### *Memorandum of Law*

27.    11 U.S.C. § 363(c)(2) provides that a debtor-in-possession may not use, sell, or

lease cash collateral, unless: (A) each entity that has an interest in such cash collateral consents;

or (B) the court, after notice and a hearing, authorizes such use, sale or lease.

28.    Manuhen has not consented to the use of the Cash Collateral[5].

29.    The Debtor has not sought, and the Court has not authorized, the use of the Cash

Collateral.

30.    11 U.S.C. § 363(c)(4) provides that a debtor-in-possession shall segregate and

account for any cash collateral in its possession, custody or control.  The Debtor has not provided

Manuhen with such accounting.

31.    11 U.S.C. § 363(e) provides, in pertinent part:

Notwithstanding any other provision of this section, at any time, on request of an
entity that has an interest in property used, sold, or leased, or proposed to be used,
sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or
condition such use, sale, or lease as is necessary to provide adequate protection of
such interest.

---

[5] Furthermore, a review of the Florida Secured Transaction Registry evidences the fact that there are numerous
junior lienholders, who may similarly have an interest in the Cash Collateral.

32.     As such, Manuhen requests that the Court enter an order, prohibiting the use of the Cash Collateral, or alternatively, conditioning the use of the Cash Collateral, pursuant to the conditions set forth above.  "Section 363(c)(2) and (e) prohibit the Debtor from using cash collateral unless all parties having an interest in the cash collateral consent or such use is authorized by the Court after a determination that interested parties are adequately protected".  *In re Harbour E. Dev., Ltd.*, 2011 WL 6097063 at 3 (Bankr. S.D. Fla. 2011) (Cristol, J.).

33.     Furthermore, it would be appropriate for the Debtor to provide Manuhen with adequate protection, pursuant to 11 U.S.C. § 361, as set forth above.

34.     Undersigned counsel has conferred with counsel for the Debtor, who is amenable to providing adequate protection to Manuhen, but who has not yet agreed to the other relief requested herein.  Undersigned counsel will continue to work with counsel for the Debtor, in an attempt to reach an amicable resolution of this Motion prior to the hearing on same.

WHEREFORE, Manuhen requests the Court enter an order: (a) prohibiting or otherwise conditioning the use of cash collateral, as set forth above; (b) providing for adequate protection; and (c) granting such other and further relief as the Court deems just and proper.

Dated:  March 8, 2023

LSS LAW
Counsel for Manuhen
2699 Stirling Road, Suite C401
Ft. Lauderdale, Florida 33312
Telephone: (954) 920-5355
Facsimile: (954) 920-5371

By:_____/s/_____
          ZACH B. SHELOMITH
          Florida Bar No. 0122548
          zbs@lss.law

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on March 8, 2023 to all parties on the list to receive e-mail notice/service for this case, via the Notice of Electronic Filing (which is incorporated herein by reference), and via U.S. Mail to all parties on the attached creditor matrix.

By:_____/s/_____
        Zach B. Shelomith

## AMENDED STOCK PURCHASE AGREEMENT

THIS AMENDED STOCK PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this 22ⁿᵈ day of December, 2020, ("Effective Date") by and among BES Associates, Corp, a Florida corporation, and/or assigns ("Buyer"), Manuhen Enterprises LLC, a Florida limited liability company ("Shareholder"), and RC Home Showcase, Inc. a Florida corporation (the "Company").

WHEREAS, the Company operates a glass product manufacturing business (the "Business"); and

WHEREAS, the Shareholder owns of record Ten Thousand (10,000) shares of common capital stock in the Company (the "Shares") which constitutes One Hundred Percent (100%) of the issued and outstanding capital stock of the Company; and

WHEREAS, the Shareholder agrees to sell, assign, transfer and deliver to the Buyer, and the Buyer agrees to purchase from the Shareholder, the Shares free and clear of all encumbrances, to be purchased by the Buyer on the Closing Date (as herein defined) upon the terms and conditions contained in this Agreement, together with all schedules and exhibits delivered in connection herewith, all of which are incorporated herein by reference (collectively the "Stock Purchase Agreement");

WHEREAS, the parties executed a Stock Purchase Agreement on or about October 16, 2020; and

WHEREAS, Buyer has completed its Due Diligence investigation; and

WHEREAS, the parties have renegotiated certain terms and conditions of the Agreement; and

WHEREAS, the parties hereby desire to amend and restate the terms and conditions of their Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations, and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound hereby, agree as follows:

## ARTICLE 1
## SALE AND PURCHASE OF SHARES; AMENDED PAYMENT TERMS

1.1    <u>Amended Terms of Sale and Purchase of Shares</u>. On the amended terms and subject to the conditions of this Agreement, at the Closing (as herein defined), Shareholder shall sell, convey, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept delivery of the Shares free and clear of any and all liens, mortgages, claims, charges, security interests, encumbrances or other restrictions or limitations whatsoever.

Exhibit A

1.2    The Amended Purchase Price. Upon the terms and subject to the conditions of this Agreement, the Parties agree that the aggregate purchase price for the Shares shall be $4,270,000.00 (the "Purchase Price"), to be paid as follows:

(a)    To secure the performance of Buyer, within two (2) business days from the date of execution of this Agreement, the Buyer shall deposit $125,000.00 (the "Escrow Deposit") into an escrow account with Weiss Serota Helfman Cole & Bierman, P.L., (the "Escrow Agent"). The Escrow Deposit becomes non-refundable upon execution of the Agreement, except in the event the Shareholder terminates this Agreement, in which case the Escrow Deposit shall be refunded to the Buyer. The Escrow Deposit shall be paid to Shareholder on the Closing Date, or within 2 Business Days from the date of termination, if this Agreement is terminated by Buyer.

(b)    At the Closing, the Buyer shall deliver to the Shareholder an aggregate cash payment in the amount of $400,000.00 (the "Closing Cash Payment"), including the Escrow Deposit. The Closing Cash Payment shall be payable by wire transfer of immediately available funds to an account or accounts designated by the Shareholder.

(c)    In addition to the Closing Cash Payment, the Buyer at Closing shall deliver to the Shareholder two (2) promissory notes, the first in the a principal amount of $2,970,000. (the "Balloon Note"). The Balloon Note shall bear interest at the rate of four percent (4%) per annum. The outstanding principal amount shall be amortized over 25 years, with consecutive monthly payments of principal and interest in the amount of $15,676.75 each, commencing thirty (30) days from the Closing Date. The entire outstanding principal balance and accrued interest shall be due and payable in the form of a balloon payment on the first anniversary of the Balloon Note. In addition to the Closing Cash Payment and the Balloon Note, at Closing, the Buyer shall deliver to Shareholder a second promissory note in the principal amount of $900,000, (the "Term Note"). The Term Note shall bear interest at the rate of 4%, per annum, The principal balance and all accrued interest shall be payable in sixty (60) equal monthly installment payments of principal and accrued interest in the amount of $16,574.87, with the first payment due sixty (60) days following the Closing Date. The Balloon Note and the Term Note are collectively referred to herein as the "Shareholder Notes."

(d)    As security for the payment of the Shareholder Notes, Eusebio Paredes shall execute and deliver to Shareholder at Closing his personal guaranty in favor of Shareholder. The Buyer shall further purchase and deliver to Shareholder a life insurance policy on Eusebio Paredes in the principal amount of the Shareholder Notes naming the Shareholder as beneficiary. Additionally, Shareholder shall be granted a security interest in all of the assets of the Business. Notwithstanding anything to the contrary contained in this Agreement, Buyer shall be prohibited from transferring or assigning any portion of the Shares and/or assets of the Business to a successor entity or assignee that is not wholly owned by Eusebio Paredes during the first twelve (12) months following the Closing Date. In the event Buyer seeks to transfer or assign any portion of the Shares and/or assets to a successor entity or assignee that is not wholly owned by Eusebio Paredes at any time during the twelve (12) month period subsequent to the Closing Date while the Balloon

Note remains outstanding, Buyer shall provide ten (10) days written notice to Shareholder in advance of such intended transfer or assignment, **and** shall satisfy in full the entire outstanding principal balance and accrued interest due under the Balloon Note, prior to or on the closing date of the transaction where such transfer or assignment is effectuated.

(e) The Company has an outstanding loan under the Paycheck Protection Program of the CARES Act in the principal amount of $814,767.00 with Pacific National Bank. (the "PPP Loan") The Company has filed an application for the forgiveness of the PPP loan. Any portion of the PPP loan that is not forgiven by the SBA within twelve months from the Closing Date shall be credited toward reducing the outstanding principal balance of the Term Note.

1.3    <u>Deliveries at Closing by Shareholder</u>. At the Closing, the Shareholder will deliver to the Buyer:

(a) stock certificates registered in the name of the Shareholder, evidencing the Shares with an executed blank stock power attached, executed by Shareholder;

(b) a certificate of active status of the Company certified as of a recent date by the Secretary of State of the State of Florida;

(c) an executed Non-Competition Agreement in a form to be mutually agreed upon by the parties within two (2) business days from the date of execution of this Agreement .

(d) certified copies of the resolutions duly adopted by the Shareholder and the Board of Directors of the Company authorizing the execution, delivery and performance of this Agreement and each of the other applicable documents and the consummation of all transactions contemplated hereby and thereby;

(e) resignation letters executed by all officers and members of the Board of Directors of the Company, effective as of the Closing Date;

(d) the minute books, stock books and ledgers and similar corporate records of the Company;

(e) the Company's Assets free and clear of any liens, security interests, pledges, charge, encumbrance, or restriction of any kind, except for the UCC-1 Financing Statement filed in connection with the Company's equipment loan in favor of Intech Funding Corp/Balboa Capital, with an outstanding principal balance of approximately $97,981.17 (the "Equipment Loan").

(f) a certificate executed by Shareholder to the effect that each of the Shareholder's representations and warranties in this Agreement was accurate in all material respects as of the date of this Agreement and is accurate in all material respects as of the Closing Date.



(i)     such other instruments and documents of Shareholder or Company, in form and substance reasonably acceptable to Buyer, as may be reasonably necessary to effect the Closing.

(j)     a Lease in substantially the form attached hereto as Exhibit "B".

1.4     <u>Deliveries at Closing by Buyer</u>.  At the Closing, Buyer will deliver to Shareholder:

(a)     the Closing Cash Payment;
(b)     the Shareholder Notes;

(c)     Personal Guaranty executed by Eusebio Paredes;

(d)     a certificate executed by Buyer to the effect that each of the Buyer's representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date.

(e)     Such other instruments and documents of Buyer, in form and substance reasonably acceptable to Shareholder, as may be reasonably necessary to effect the Closing.

(f)     Fully executed Lease.

## ARTICLE 2
## CLOSING

2.1     <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place remotely via the exchange of executed documents and other closing deliverables, on or before December 30, 2020 ("Closing Date"), or such other date as the parties shall mutually agree.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Shareholder and Company represent and warrant to the Buyer with respect to the Company, except with respect to Buyer's father's prior ownership of stock in the Company and except as set forth in the attached Disclosure Schedules, that the following statements are correct and complete in all material respects, as of the Effective Date and as of the Closing Date:

3.1     <u>Organization of the Company</u>. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Florida.  The Company is duly qualified to transact business in the state of Florida which is the only jurisdiction in which the ownership or leasing of its assets or the conduct of its Business requires such qualification, and no other jurisdiction has demanded, requested or otherwise indicated that the Company be required to so qualify. The Company has full corporate power and authority to own or lease and to operate and use their properties and assets and to carry on the Business as now conducted. The Shareholder



has delivered to the Buyer true and complete copies of the Company: (i) Articles of Incorporation, as in effect on the date hereof, (ii) by-laws, as in effect on the date hereof; and (iii) minute books and stock transfer records.

3.2    <u>Subsidiaries and Investments</u>.    The Company does not, directly or indirectly, (i) own, of record or beneficially, any outstanding equity interests in any corporation, partnership, joint venture or other entity, or (ii) control any corporation, partnership, limited liability company, joint venture or other entity.

3.3    <u>Capitalization</u>.

(a)    The authorized capital stock of the Company consists of: Ten Thousand (10,000) shares of common stock, $1.00 par value per share, 10,000 shares of which are currently issued and outstanding. One Hundred Percent (100%) of the Shares are owned of record and beneficially by the Shareholder.

(b)    All of the Shares have been duly authorized, are validly issued and fully paid and nonassessable, and are not subject to, and were not issued in violation of, any purchase option, call option, right of first refusal, subscription right, preemptive or any similar right. None of the issued and outstanding Shares was issued in violation of applicable federal or state securities laws, including the Securities Act of 1933, as amended (the "<u>Securities Act</u>").    There are no accrued and unpaid dividends (whether or not declared) with respect to the Shares, There are no agreements, arrangements, warrants, options, puts, calls, rights or other commitments, plans, understandings of any character or pending or threatened actions relating to the issuance, sale, purchase, redemption, conversion, exchange, registration, voting or transfer of the Shares or any other securities of the Company. The Company and the Shareholder are not a party to any Shareholder agreement, voting trust agreement or any other similar contract, agreement, arrangement, commitment, plan or understanding restricting or otherwise relating to the voting, dividend, ownership or transfer rights of the Shares. There are no accrued dividends, shareholder loans or any other compensation or monies of any kind owing by the Company to the Shareholder or other Person in connection with the employment or ownership in the Company that will not be satisfied and discharged in full by the payment of the Purchase Price pursuant to <u>Section 1.2</u> of this Agreement.

3.4    <u>Non-Contravention</u>. Neither the consummation of any of the transactions contemplated in this Agreement or compliance with or fulfillment of the terms, conditions and provisions hereof by the Company will:

(a)    Except as set forth in <u>Schedule 3.4(a)</u>, conflict with, result in a breach of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any encumbrance upon the assets of the Company under (i) its Articles of Incorporation or by-laws, (ii) any agreement of which the Company is  a party, (iii) violate any law or order by which the Company is bound, or (iv) result in the creation of any encumbrance on the  Company's Common Stock;

(b)      No consent, order, or filing with, or notification to any Person, including any governmental body, is required on behalf of  the Company or the Shareholder in connection with the execution, delivery and performance by such party of this Agreement, or the compliance by such party of any of the provisions hereof.

3.5      Financial Statements.  The Company's audited Financial Statements for calendar years 2018, 2019 and unaudited income statement and balance sheet (the "Balance Sheet") for the six (6) month period from January 1, 2020 through June 30, 2020 are attached hereto as Schedule 3.5 (collectively the "Financial Statements").  Except as set forth in Schedule 3.5, the Financial Statements have been prepared in accordance with GAAP and present fairly the financial condition and results of operations of the Company as of the dates and for the periods indicated therein.

3.6      Recent Operations.  Except as set forth in Schedule 3.6, during the period from December 31, 2019 to the date hereof, the Company has not conducted its business other than in the ordinary course of business consistent with past practice and:

(a)      There has been no material adverse change in the Business or the results of operations, assets, properties, condition (financial or otherwise) of the Company;

(b)      The Company has not made any declaration or payment of any dividends or distributions in respect of any capital stock or other security of the Company or redemption, purchase, or acquisition of any capital stock or other securities of the Company or made any other payment to or on behalf of the Shareholder or any affiliate thereof;

(c)      There has not been any sale, transfer, agreement to issue, granting of any option, warranty or right to purchase,  split, combination or reclassification of any shares of capital stock or other security of the Company;

(d)      The Company has not transferred, assigned or granted any license or sublicense of any rights with respect to any Intellectual Property;

(e)      The Company has not made any change in the rate of compensation, commission, or bonus payable, or paid or agreed or orally promised to pay any bonus, incentive, retention or other compensation, retirement, welfare, fringe or severance benefit or vacation pay to or in respect of any director, officer, employee, independent contractor or agent of the Company, other than in the ordinary course of business consistent with past practice;

(f)      The Company has not entered into or amended any employment, deferred compensation, severance or other similar agreement;

(g)      There has not been any change by the Company in accounting or tax reporting principles, methods or policies, any settlement for any tax controversy, any amendment of any tax return, or any tax election by or with respect to the Company, and the Company has not taken any action, omitted to take any action or entered into any other

transaction that would have the effect of increasing the tax liability of the Buyer in respect of any tax period that ends after the Closing Date;

(h)     Except for the transactions contemplated by this Agreement, the Company has not entered into or amended any contract other than entering into or amending contracts with customers or suppliers  in the ordinary course of business consistent with past practice;

(i)     The Company has not made any loans, advances or capital contributions to, or investments in or to any persons or entities;

(j)     The Company has not mortgaged, pledged or subjected to any encumbrance any of their assets, or acquired any assets or sold, assigned, transferred, conveyed, leased or otherwise disposed of any assets of the Company, except for goods and services sold to customers in the ordinary course of business consistent with past practice;

(k)     The Company has not canceled or compromised any debt or claim or amended, canceled, waived or released any contract or right;

(l)     The Company has not amended their governing documents;

(m)     The Company has not adopted any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consented to the filing of any bankruptcy petition against it under any similar law or agreement with respect to the sale of its assets, securities, or the Business;

(n)     The Company has not issued any equity or debt securities or any security exercisable for or convertible into equity securities of the Company;

(o)     The Company have not made any capital expenditures in excess of $25,000.00 in the aggregate;

(p)     The Company has not purchased, leased, or otherwise acquired the right to own, use or lease any property or assets for an amount in excess of $10,000.00, individually, or $25,000.00,  in the aggregate; and

(q)     The Company has not entered into any agreements or commitments to do or perform in the future any actions referred to in this Section 3.6.

3.7     No Undisclosed Liabilities.  To the knowledge of Shareholder, the Company is not subject to any liability (including unasserted claims), whether known or unknown, absolute, contingent, accrued or otherwise, which is not shown or which is in excess of amounts shown or reserved for on the Financial Statements, other than liabilities reasonably incurred in the ordinary course of Business consistent with past practice, after December 31, 2019, or as set forth on Schedule 3.7.

3.8    Taxes.

(a)    The Company has timely filed with the appropriate taxing authorities all Tax Returns that the Company has been required to file. All such Tax Returns are true, correct, and complete in all material respects. All Taxes owed by the Company (whether or not shown on any Tax Return) have been paid. Adequate reserves have been established to provide for the payment of any Taxes that are not yet due or payable with respect to the Company for taxable periods or portions thereof ending on or before the Balance Sheet Date. The Company is not the beneficiary of any extension of time within which to file any Tax Return. No written claim has been made by a taxing authority with respect to the Company in a jurisdiction where the Company does not file Tax Returns that the Company are or may be subject to taxation by that jurisdiction. There are no liens on any of the assets of the Company that have arisen in connection with any failure (or alleged failure) to pay any Tax.

(b)    The Company has withheld and paid to the appropriate taxing authorities all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder, or third party.

(c)    No deficiency or proposed adjustment that has not been settled or otherwise resolved for any amount of Taxes has been asserted or assessed by any taxing authority against the Company.

(d)    The Company has not waived or extended any statute of limitations in respect of Taxes or agreed to any extension of time with respect to the assessment, payment or collection of any Tax.

(e)    There is no action, suit, examination, investigation, proceeding by any governmental body, or audit or claim for refund pending, or, to the Knowledge of the Shareholder, threatened against or with respect to the Company regarding Taxes.

3.9    Availability of Assets and Legality of Use.    The assets owned or leased by the Company, or which the Company is entitled to use under license or other agreements, constitute all of the assets currently used by the Company in the conduct of the Business in the manner and to the extent presently conducted (including all books, records, computers and computer programs and data processing systems). The assets owned or leased by the Company are in good working condition. The Company' use of all such assets conform in all material respects with all applicable Law (including all applicable electrical, building, zoning, environmental and occupational safety and health Law) and no written notice of any existing violation of any of such matters relating to such assets or their use has been received by the Company.

3.10    Compliance with Laws; Permits.

(a)    The Company is in compliance with all laws applicable to the Company or the operation, use, occupancy, or ownership of the Company's assets or properties or the



8

conduct of the Company's Business. The Company has not received written notice from any Governmental Body of any failure to comply with any law. There is no investigation by a Governmental Body pending against, or to the Shareholders' Knowledge, threatened against the Company.

(b)    Schedule 3.10(b) contains a complete and accurate list of all licenses, franchises, permits, privileges, variances, immunities, approvals and other authorizations from all Governmental Bodies, or any other similar third party which are necessary to entitle it to own, lease, operate and use its assets and properties and to carry on and conduct the Business substantially as currently conducted, including (herein collectively called "Permits").

(c)    The Company is in compliance in all material respects with all the terms and conditions of each Permit identified or required to be identified in Schedule 3.10(b), the Company has not received any notice or any other communication (whether oral or written) from any Governmental Body regarding (A) any actual or alleged violation of or failure to comply with any term or requirement of any Permit or (B) any actual or proposed revocation, withdrawal, suspension, cancellation, termination of or modification to any Permit; and (C) all applications required to have been filed for the renewal of each Permit required to be identified in Schedule 3.10(b) have been duly filed on a timely basis with the appropriate Governmental Bodies. To the Knowledge of the Shareholders, the Permits identified in Schedule 3.10(b) collectively constitute all of the material Permits necessary to enable the Company to lawfully conduct and operate the Business and to own and use their assets in the manner in which they currently own and use such assets.

3.11    Real Property. An affiliate of Shareholder owns the real estate located at 16115 N.W. 52nd Avenue, Miami, Florida 33014. (the "Real Property")  Other than the lease to Leading Edge Aerospace, LLC, which premises contain approximately 18,590 square feet with a lease expiration date of April 30 2024, and the Company's lease of the Real Property, there are no subleases, tenancies or other rights of occupancy affecting all or any part of the Real Property. Neither the whole nor any part of any Real Property is subject to any pending suit for condemnation or other taking by any public authority, and (ii) to the Knowledge of Shareholder as of the date of execution of this Agreement, no such condemnation or other taking is threatened.

3.12    Personal Property.

(a)    Schedule 3.12(a) contains a detailed list and brief description as of the date hereof of all machinery, equipment, vehicles, furniture and other personal property owned by the Company.

(b)    Schedule 3.12(b) contains a detailed list and brief description as of the date hereof of all machinery, equipment, vehicles, furniture and other personal property leased by the Company (the "Personal Property Leases").

3.13    Intellectual Property; Software.



(a)     Schedule 3.13 contains a list and description, if any, of (i) all registered Copyrights, Patent Rights and registered Trademarks (including all assumed or fictitious names under which the Company are conducting business or has conducted business) owned by the Company; (ii) all material Software owned by or licensed to the Company; and (iii) all agreements, contracts, licenses, sublicenses, assignments and indemnities (the "Intellectual Property Agreements") that relates to any other Intellectual Property which is used in the Business.

(b)     Except as disclosed in Schedule 3.13, the Company either:  (i) owns all right, title and interest in and to the Intellectual Property and Software used in the Business free and clear of any Encumbrance; or (ii) has the right to use the same pursuant to a written agreement.  Except as set forth in Schedule 3.13, the Company is listed in the records of the appropriate United States, state or non-United States registry as the sole current owner of record for each application and registration required to be identified in Schedule 3.13 as being owned by the Company.

3.14    Accounts Receivable.  All trade accounts receivable of the Company have arisen from bona fide transactions by the Company in the ordinary course of its Business and are not subject to counterclaims or setoffs.  A schedule of the trade accounts receivable as of August 31, 2020 including the aging of the receivables is contained on Schedule 3.14. To the Shareholders' Knowledge, except as set forth on Schedule 3.14, all of the trade accounts receivable are good and collectible in the ordinary course of the Business at the aggregate amounts recorded in respect thereof, net of any applicable allowance for doubtful accounts, which allowances have been determined on a basis consistent with the Company's past practice of determining allowances for doubtful accounts reflected on the Balance Sheet.

3.15    Title to Assets.  The Company is the legal and equitable owner of all right, title and interest in, and has good, valid and merchantable title to, all of the Company's owned assets, free and clear of all encumbrances.

3.16    Employees.  Schedule 3.16 contains a list of all persons who are officers, directors, employees or consultants of the Company as of the date hereof, and sets forth for each such employee the following:  (a) name, (b) title or position (including whether full or part time), (c) hire date, (d) 2019 and current annual base salary or hourly rate of pay, and (e) bonus received in 2019 and 2020 if any, and projected bonus for 2020, if any.  All compensation, in any form, received by the Employees is set forth on Schedule 3.16. As of the date hereof, all bonuses due and payable to officers, employees and consultants (and each other person providing services to the Business) of the Company for services performed on or prior to the date hereof have been paid in full or are accrued on the Balance Sheet and there are no outstanding agreements, understandings or commitments of the Company with respect to any bonuses or increases in compensation.

3.17    Employee Matters.  The Company is in compliance in all material respects with all laws relating to the employment of labor, including all laws relating to wages, hours, discrimination, sexual harassment, civil rights, immigration, safety and health, worker classification, workers' compensation and the collection and payment of withholding Taxes, social security Taxes and similar Taxes,  There are no material lawsuits, grievances, arbitrations,



10

administrative hearings, employment standards complaints, pay equity complaints, occupational health and safety charges, claims or investigations of wrongful (including constructive) discharge, employment discrimination or retaliation, sexual harassment, unfair labor practice charges or complaints or other material employment disputes of any nature pending or, to the Shareholder's Knowledge, threatened, against the Company. There are no collective bargaining or other labor union agreements to which the Company is a party or by which the Company is bound. None of the employees of the Company are represented by any union with respect to their employment by the Company. The Company has not experienced any material labor disputes, union organization attempts or work stoppages, slowdowns or lockouts due to labor disagreements.

3.18    Company Benefit Plans and Compensation.

(a)    Schedule 3.18 sets forth a true and complete list of the Company Benefit Plans (the "Benefit Plans")  The Company has delivered to Buyer with respect to each Benefit Plan, as applicable, true, current and complete copies of (i) the governing plan document (or, with respect to any unwritten Benefit Plan, a written summary thereof), and related trust agreements, insurance contracts and other funding mechanisms and all amendments thereto, (ii) the current summary plan description and all summaries of material modifications, (iii) the Form 5500 annual reports and accompanying schedules received from or provided to the Department of Labor, the Pension Benefit Guaranty Corporation, the IRS or any other Governmental Body during the past three years.

(b)    Each Benefit Plan has been maintained and operated in conformity with its governing plan document and all applicable laws, including the Code and ERISA (including the plan sponsor's filing and disclosure obligations). Each Benefit Plan that is intended to be a qualified plan within the meaning of Section 401(a) of the Code is so qualified and, to the Shareholder's Knowledge, no circumstances exist which could result in loss of such qualification under Section 401(a) of the Code, and each such Benefit Plan has received an IRS determination letter or is entitled to rely on a prototype opinion letter and the has delivered each such letter to Buyer. There is no pending audit or, to the Shareholders' Knowledge, inquiry or examination pending or threatened by the IRS, the Department of Labor, the Pension Benefit Guaranty Corporation or any other Governmental Body with respect to any of the Company Benefit Plan.

(c)    Neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement (either alone or in combination with another event) will or is reasonably expected to (i) entitle any current or former director, officer, employee or consultant of the Company to any payment (including severance pay or similar compensation), any cancellation of indebtedness, or any increase in compensation; (ii) result in the acceleration of payment, funding or vesting under any Benefit Plan; or (iii) result in any increase in benefits payable under any Benefit Plan.

(d)    With respect to any Benefit Plan for which a separate fund of assets is or is required to be maintained, all obligations accrued on or prior to the Closing Date which are not yet due have either been made or have been accrued on the Balance Sheet. All premiums, fees and administrative expenses required to be paid under or in connection with



the Benefit Plans for the period on or before the Closing Date have been paid or have been accrued in full on the Balance Sheet.

3.19    Contracts.  Except as set forth in Schedule 3.19, the Company is not a party to or bound by any:

(a)    employment agreement, offer letter or contract with any current officer, director or employee;

(b)    sales, service or master service agreement involving annual payments to the Company in excess of $10,000.00;

(c)    management service, employment or any other similar type of agreement involving annual payments to the Company in excess of $10,000.00;

(d)    agreement relating to Indebtedness, any instrument guaranteeing any Indebtedness or any obligation to incur any of the foregoing;

(e)    agreement which includes provisions regarding minimum volumes or volume discounts, excluding outstanding price quotations;

(f)    agreement pursuant to which a rebate, discount, bonus, commission or other payment with respect to the sale of any product or service of the Company will be payable or required after the Closing;

(g)    guarantee of the obligations of customers, suppliers, officers, directors, employees or Affiliates or other Persons;

(h)    agreement limiting the Company ability to engage in any business anywhere in the world;

(i)    contract which provides for, or relates to, any non-competition or confidentiality arrangement with any Person, including any current or former officer or employee of the Company;

(j)    contract or group of related contracts for capital expenditures in excess of $10,000 for any single project or related series of projects;

(k)    contract or agreement with any customer of the Business, involving annual payments to or by the Company in excess of $10,000.00;

(l)    contract containing "most-favored nation" pricing or similar pricing terms;

(m)    contract (other than this Agreement and the Ancillary Agreements) relating to any acquisition, sale, merger or divestiture of or by the Company (or any of their

12



Affiliates) which contains any ongoing indemnification obligation by or to the Company (or any of its respective Affiliates) in effect as of the date hereof;

      (n)     contract not made in the ordinary course of the Business; or

      (o)     other contract, agreement, commitment, understanding or instrument which is material to the Company or the conduct of the Business.

      3.20    <u>Customers</u>. <u>Schedule 3.20</u> sets forth a true and complete list of each customer in respect of which the Company generated more than $25,000.00 of revenues during calendar year 2019 and year to date 2020. Except as set forth on Schedule 3.20, since December 31, 2019 there has not been (i) any material adverse change in the business relationship of the Company with any customer set forth or required to be set forth in Schedule 3.20; or (ii) any amendment of any material terms of the services agreement or related agreement with any such customer.

      3.21    <u>Effect of Transaction</u>. To the Shareholder's Knowledge, as of the date hereof, no creditor, employee, supplier, client, customer or other Person having a material business relationship with the Company has changed, or informed the Shareholder or any officer of the Company that such Person intends to change, such relationship because of the purchase and sale of the Company or the execution and delivery of this Agreement and the Ancillary Agreements, which change, individually or in the aggregate with other such changes, have had or would reasonably be expected to have a material adverse effect on the Company.

      3.22    <u>No Violation, Litigation or Regulatory Action</u>.

      (a)     The Company has complied in all material respects with all Laws and any writs, injunctions, ordinances, franchises, decrees, stipulations, awards or orders of any Governmental Body which are applicable to the Company or the Business;

      (b)     The Company has not taken any action that would require notification to the employees of the Company pursuant to the provisions of the WARN Act (or any state equivalent) or that would cause the Company, or after the Closing, Buyer, to have any liability thereunder;

      (c)     There are no lawsuits, claims, suits, governmental inquiries, investigations (formal or informal) or proceedings pending or, to the Shareholder's' Knowledge, threatened against the Company. There are no lawsuits, suits, investigations or proceedings pending or contemplated in which the Company or Shareholders is the plaintiff or claimant; and

      (d)     There is no action, suit or proceeding pending or, to the Shareholder's Knowledge, threatened which questions the legality or propriety of the transactions contemplated by this Agreement.

      3.23    <u>Insurance</u>. The Company maintains policies of fire and casualty, liability (general, products and other liability), workers' compensation and other forms of insurance and bonds in



such amounts and against such risks and losses as are insured against by a company engaged in the same or a similar business. Schedule 3.23 sets forth a list and brief description of all policies of insurance maintained, owned or held by the Company on the date hereof. Each of such policies is in full force and effect and to the Shareholder's Knowledge will not in any way be affected by or terminate or lapse by reason of the transactions contemplated by this Agreement.

3.24    Warranties.  Except as set forth in Schedule 3.24, the Company has not given or made any written warranties or, to the Shareholders' Knowledge, any oral warranties, to third parties with respect to any services performed or products sold by its Schedule 3.24 sets forth a brief description of each material claim currently pending or, to the Shareholders' Knowledge, threatened against the Company on account of any express or implied warranty.

3.25    Environmental Protection.  The operations of the Company are currently in material compliance with all applicable federal, state or local statutes, laws, ordinances, codes, rules, regulations, guidelines or any binding determinations of any Governmental Body (including consent decrees and administrative orders) relating to protection of the environment or public or worker health and safety or the handling, storage, disposal or Release of any Contaminant (collectively, "Environmental Laws") and all applicable material licenses and permits with respect to Environmental Laws ("Environmental Permits"). The Company has obtained and currently maintains all Environmental Permits required under all applicable Environmental Laws necessary to operate the Business. The Company is not the subject of any outstanding order with any Governmental Body respecting any Environmental Laws or any Release or threatened Release of any Contaminant. The Company has not received any written communication from any Governmental Body alleging that either the Company may be in violation of any Environmental Law or Environmental Permit or that the Company may have any liability under any Environmental Law.

3.26    Broker Fee.  The Company has not paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

3.27    Transactions with Affiliates.  Except as set forth in Schedule 3.27, no employee, officer, director or consultant of the Company or the Shareholder, is directly or, to the Shareholders' Knowledge, indirectly indebted to the Company, and the Company is not indebted (or committed to make loans or extend or guarantee credit) to any such Person, other than accrued payable obligations reflected as such on the Balance Sheet. Except as set forth in Schedule 3.27, no employee, officer, director or consultant of the Company or, to the Shareholder indirectly, in whole or in part, or has any other interest in any tangible or intangible property that the Company uses or has used in the conduct of the Business that is material to the ownership or operation of the Company. Except as set forth in Schedule 3.27, no employee, officer, director or consultant of the Company or the Shareholder has any direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation that competes with the Company except stock ownership by employees, shareholders, officers, or directors of the Company in publicly traded Company. Except as set forth in Schedule 3.27, no officer or director of the Company or the Shareholder is, directly or indirectly, interested in any material contract with the Company.

3.28    Indebtedness.  Except as set forth in Schedule 3.28 and except for accounts payable and accrued liabilities incurred in the ordinary course of the Business, the Company is not obligated with respect to, and has no liability for, any Indebtedness. Except as set forth in Schedule 3.28, Buyer shall be deemed to have satisfied all obligations of payment of the Company to the Shareholders and the Company shall have no further payment obligations to the Shareholder including loan repayment, salary, dividends, fees or any other payment obligations.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES**
**OF THE SHAREHOLDER**

The Shareholder represents and warrants to the Buyer that the following statements are correct and complete in all material respects both as of the Effective Date and as of the Closing Date:

4.1    Authority.  The Shareholder has the capacity to enter into this Agreement and to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof.  Assuming the valid execution and delivery of this Agreement by the other parties thereto, this Agreement constitutes the valid and binding obligations of the Shareholder, enforceable in accordance with their terms.  Such Shareholder has approved and/or consented to the sale of the Shares to Buyer and to this Agreement and the consummation of the transactions contemplated hereby.

4.2    Non-Contravention; Required Consents.  Except as set forth on Schedule 4.2(a), none of the execution or delivery of this Agreement, nor the consummation of the transactions contemplated hereby or thereby, or compliance with or fulfillment of the terms, conditions and provisions hereof or thereof, by such Shareholder (a) will result in the breach of any term or provision of, constitute a default under, or accelerate or change the performance otherwise required under, or result in the creation of any encumbrance upon the Shares pursuant to, any agreement (including any loan agreement or promissory note), indenture, instrument, order, law or regulation to which such Shareholder is a party or by which such Shareholder is bound; or (b) require the approval, consent, waiver, authorization or act of, or the making by the Shareholder of any declaration, filing or registration with any third party or any Governmental Body.

4.3    Ownership of Shares in Company.  The Shares are owned by the Shareholder, free and clear of all liens and encumbrances. The Shareholder is not a party to any Shareholder agreement, voting trust agreement or any other similar contract, agreement, arrangement, commitment, plan or understanding restricting or otherwise relating to the voting, dividend, ownership or transfer rights of the Shares. The Shareholder has not paid and is not obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

4.4    No Existing Claims.  The Shareholder has no existing claim against the Company or the board of directors of the Company relating to any matter arising from or relating to any action taken prior to the Closing by the Company or the board of directors of the Company,

including, but not limited to, the negotiation, approval and delivery of this Agreement and the transactions contemplated by this Agreement.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby makes the following representations and warranties to the Shareholder, each of which shall be true and correct in all material respects both as of the date of execution of this Agreement and as of the Closing Date.

5.1     Corporate Existence and Qualification. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida. The Buyer has the corporate power to carry on its business as is presently conducted and to own and operate its Assets.

5.2     Authority, Approval and Enforceability. This Agreement has been duly executed and delivered by the Buyer, and the Buyer has all requisite power and legal capacity to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  Upon execution and delivery, this Agreement will constitute the legal, valid, and binding obligation of the Buyer, enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, or similar laws and judicial decisions which affect creditors' rights generally.

5.3     No Violation.  The execution, delivery and performance by the Buyer of this Agreement, and any and all other agreements contemplated hereby, and the fulfillment of and compliance with the respective terms hereof  and thereof by the Buyer, do not and will not (a) conflict with or result in a breach of the terms, conditions or provisions of , (b) result in a violation of, or (c) require any authorization, consent, approval, exemption or other action by or notice to any Court or Authority pursuant to any Regulation to which the Buyer is subject, or any Contract or Order to which the Buyer is subject.  The Buyer will comply with all applicable Regulations and Orders in connection with its execution, delivery and performance of this Agreement and the transaction contemplated hereby.

5.4     No Proceeding.          No suit, action, or other proceeding is pending before any Governmental Body seeking to restrain or prohibit Buyer from entering into this Agreement or to prohibit the Closing or performance of any obligation hereunder.

5.5     Brokerage. The Buyer has not employed any broker, finder, advisor, consultant or other intermediary in connection with this Agreement or the transactions contemplated by this Agreement who is, or might be, entitled to any fee, commission or other compensation from the Company or the Shareholder, or from the Buyer or its affiliates, upon or as a result of the execution of this Agreement or the consummation of the transaction contemplated hereby.

## ARTICLE 6
## DUE DILIGENCE AND LOAN APPROVAL

16



6.1     Financial and Legal Due Diligence.  The Buyer hereby acknowledges that it has completed its due diligence inquiry of the Shareholder, the Company, and the Business (the "Due Diligence") pursuant to a Mutual Confidentiality and Non-Disclosure Agreement dated as of October 7, 2019.

**ARTICLE 7**
**CERTAIN COVENANTS AND AGREEMENTS OF THE PARTIES**

7.1     Conduct of Business Prior to the Closing Date.  From the date of this Agreement until the Closing, Shareholder and the Company shall conduct its Business in the ordinary course of business and shall use its commercially reasonable efforts to continue its relationships with suppliers, customers and others having business relationships with it in respect of the Business. Without limiting the generality of the foregoing, except with the prior written consent of Buyer, from the date hereof until the Closing Date, the Company and Shareholder shall not:

(a)     adopt or propose any change in its Articles of Incorporation, By Laws, or other governing documents;

(b)     adopt a plan or agreement of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other material reorganization of the Company;

(c)     issue, sell, transfer, pledge, dispose of or encumber any shares of, or securities convertible into or exchangeable for, or options, warrants, calls, commitments or rights of any kind to acquire, any shares of capital stock (or of equity interests) of the Company;

(d)     split, combine, subdivide or reclassify its outstanding shares of capital stock or equity interests, or declare, set aside or pay any dividend or other distribution payable in stock or property with respect to its capital stock or equity interests;

(e)     redeem, purchase or otherwise acquire any of the Company's capital stock;

(f)     make or commit to make any capital expenditure in excess of $5,000, other than in the ordinary course of business;

(g)     (i) increase the compensation or benefits of any member or employee, except as required under any existing agreement or commitment, all of which have been disclosed to Buyer; (ii) enter into (or adopt) any new, or amend any existing, Compensation and Benefit Plan; or (iii) hire any new employee at the level of manager or above or promote any Person to manager or above

(h)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any equity interest in or assets of, any business or any entity or division thereof;



(i)       sell, lease, encumber (including by the grant of any option thereon) or otherwise dispose of any Assets except pursuant to existing Contracts or commitments disclosed to Buyer or with respect to the sale of inventory or services of the Company, other than in the ordinary course of business;

(j)       (i) incur or assume any long-term or short-term debt or issue any debt securities; (ii) assume, guarantee, endorse or otherwise become liable or responsible (directly, contingently or otherwise) for the obligations of any other Person; (iii) make, cancel or waive any rights with respect to any loans, advances or capital contributions to, or investments in, any other Person; (iv) pledge or encumber shares of capital stock or equity interests of the Company; or (v) mortgage or pledge any of the tangible or intangible Assets of the Company;

(k)       enter into any license or other contract with respect to any Intellectual Property or enter into any consulting or independent contractor arrangement;

(l)       directly or indirectly engage in any transaction with, or enter into any contract with, any director, officer, shareholder or affiliate of the Company or any family member of any such Person which relates to the business of the Company;

(m)       Change any method of accounting or accounting practice used by the Company, except any change required by reason of a concurrent change in GAAP;

(n)       Amend, modify or otherwise change the terms of any existing contract to accelerate the payments due to the Company thereunder;

(o)       Enter into any joint venture, partnership or other similar arrangement;

(p)       (i) make or change any Tax election; (ii) settle any Tax audit; (iii) file any amended Tax Return; or (iv) consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating to the Company, in each case, that is reasonably likely to result in a Tax liability to the Company;

(q)       Enter into any contract that limits the ability of the Company, or would limit the ability of the Company after the Closing, to compete in or conduct any line of business or compete with any Person in any geographic area or during any period;

(r)       Enter into, modify, amend or terminate any contract, or waive, release or assign any material rights or claims thereunder, other than in the ordinary course of business;

(s)       enter into any Contract to the extent consummation of the transactions contemplated by this Agreement or compliance by the Company with the provisions of this Agreement would reasonably be expected to conflict with, or result in a violation or breach of, or default under, or give rise to a right of or result in, termination, cancellation or acceleration thereof, or result in the creation of any Lien in or upon any of the Assets of



the Company under, or give rise to any increased, additional, accelerated, or guaranteed right or entitlements of any third party under, or result in any material alteration of, any provision of such contract;

(t)    take any action that would reasonably be expected to cause any of the representations and warranties of the Shareholders or the Company not to be true and correct as of the date of such action or as of the Closing or otherwise prevent, materially delay or materially impede the consummation of the transactions contemplated hereby; and

(u)    agree or commit to do any of the foregoing.

7.2    <u>Commercially Reasonable Efforts to Closing</u>.  Upon the terms and subject to the conditions set forth in this Agreement, the Company, Shareholder and Buyer shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to cause the conditions set forth in this Agreement to close the transaction to be satisfied.

7.3    <u>Tax Matters</u>.  The following provisions shall govern certain Tax matters:

(a)    in the case of any Tax period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any Taxes based on or measured by income or receipts of the Company shall be determined based on an interim closing of the books as of the close of business on the Closing Date and the amount of other Taxes of the Company for a Straddle Period which relate to any taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days beginning on the first day of such Straddle Period and ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

(b)    All Taxes due upon transfer of the Shares, if any, shall be paid when due by Buyer. The documentary stamp taxes on the Shareholder Notes shall be paid by the Buyer at Closing. The Buyer will file all necessary Tax Returns and other documentation with respect to all such Taxes at Buyer's expense (except that, with respect to any Tax Returns or amendments to any Tax Returns for periods prior to the Closing, which will be at the expense of Shareholder) and, if required by applicable law, Shareholder will execute any such Tax Returns or other documentation.

(c)    The Buyer, the Company, and Shareholder shall cooperate fully, to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Company and Shareholder agree to retain all books and records with respect to Tax matters pertinent to



the Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitation (and, to the extent notified by Buyer or Shareholder, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Tax authority.

(d)     The Shareholder agrees, upon request, to use commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

7.4     Retention of Employees.  The Company and the Shareholder will reasonably cooperate with Buyer in Buyer's efforts to retain certain of the Company's employees, independent contractors, consultants and/or agents, if any, prior to the Closing as determined by Buyer during its due diligence review of the Company. Prior to the Closing, the Shareholder shall use commercially reasonable efforts to preserve intact the current business organization of the Company, keep available the services of the current officers, employees, and agents of the Company, and maintain the relations and good will with suppliers, customers, landlords, creditors, employees, agents, and others having business relationships with the Company; confer with Buyer concerning operational matters of a material nature; and otherwise report periodically to Buyer concerning material changes to the status of the business operations, and finances of the Company.

7.5     Notification.  Between the date of this Agreement and the Closing date, the Shareholder will promptly notify the Buyer in writing if the Shareholder or the Company becomes aware of any fact or condition that causes or constitutes a material breach of any of the Shareholder or Company representations and warranties as of the date of this Agreement, or if the Shareholder or the Company becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a material breach of any such representation or warranty.

7.6     Payment of Indebtedness by Related Persons.  Except as expressly provided in this Agreement, Shareholder will cause all indebtedness (other than trade payables incurred in the normal course of Business and the Equipment Loan) owed to the Company by the Shareholder or any related person of Shareholder to be paid in full prior to or at Closing. Schedule 7.6 contains a detailed list of all trade payables as of the date hereof. On the Closing Date the trade accounts receivable of the Company shall exceed the trade accounts payable of the Company.  In the event that the trade accounts receivable at Closing do not exceed the trade accounts payable, the Term Note shall be reduced by the difference between either (a) the actual amount by which the trade accounts receivable exceed the trade accounts payable or (b) the actual amount by which the trade accounts payable exceed the trade accounts receivable.

7.7     Excluded Liabilities.  All Company liabilities, except for all trade accounts payable and the Equipment Loan which are hereby expressly assumed by the Buyer, are excluded and not assumed, including but not limited to, notes, payable/receivable among shareholders, notes payable to any banks, accrued vacation time for shareholders and/or employees, all payroll related



taxes and withholdings, and all accrued and/or contingent liabilities arising on or before the Closing Date. The Shareholder will continue to be liable for and will discharge all liabilities arising on or before Closing which are not assumed by Buyer as of the Closing Date.

      7.8    <u>Excluded Assets</u>. The only excluded assets are: cash in bank and on hand on the Closing Date.

      7.9    <u>Work in Progress</u>. Schedule 7.9 contains a list of all projects of the Company which have commenced but have not been completed (the "Jobs in Progress") Two days before Closing, Schedule 7.9 shall be updated to reflect the Jobs in Progress as of the Closing Date. The parties shall prorate at Closing each Job in Progress based upon its percentage of completion.

## ARTICLE 8
## CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

      Buyer's obligation to purchase the Shares and to take the other actions required to be taken by Buyer at the Closing to consummate the transactions contemplated by this Agreement, is subject to fulfillment on, or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer in whole or in part, to the extent permitted by applicable law):

      8.1    <u>Accuracy of Representation</u>. All of the representations and warranties of the Shareholder and the Company set forth in Articles 3 and 4 of this Agreement must be true and correct in all material respects as of the date of this Agreement, and must be true and correct as of the Closing Date except that representations and warranties made as of a specified date shall be true and correct as of such date.

      8.2    <u>Shareholder's Performance</u>. All of the covenants and obligations that Shareholder required to perform or to comply with pursuant to this Agreement at or prior to the Closing must have been duly performed and complied with. Each document required to be delivered pursuant to this Agreement must have been delivered, and each of the other covenants and obligations in must have been performed and complied with in all respects.

      8.3    <u>No Proceedings</u>. Since the date of this Agreement, there must not have been commenced or to the Knowledge of Shareholder, threatened against Company or Shareholder or their affiliates any Proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the contemplated transactions, (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the contemplated transactions.

      8.4    <u>No Claim Regarding Stock Ownership or Sale Proceeds</u>. There must not have been made or threatened by any person any claim asserting that such person (a) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any stock of, or any other voting, equity, or ownership interest in, any of the Company, or (b) is entitled to all or any portion of the Purchase Price payable for the Shares.



8.5    <u>No Prohibition</u>.    Neither the consummation nor the performance of any of the contemplated transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise formally proposed by or before any Governmental Body.

8.6    <u>Lease for Business Premises</u>. The Shareholder shall execute and deliver a lease for the Real Property ("Lease") in substantially the  form attached hereto as Exhibit "B", and signed by Buyer and Shareholder at Closing.   The Lease shall have an initial term of five (5) years with an option to extend for one additional renewal term of five (5) years. The Monthly rent due during the first year of the Lease term shall be $57,225.00 per month with a 3% increase each year thereafter during the initial and extension terms of the Lease.   In the event the Buyer assigns or transfers the Shares or assets of the Business to a successor entity that replaces Buyer as the tenant, the new entity shall meet the requirements of a successor entity or assignee as set forth in Section 8.04(c) of the form of Lease attached hereto as Exhibit "B".

## ARTICLE 9
## CONDITIONS PRECEDENT TO SHAREHOLDER'S OBLIGATION TO CLOSE

Shareholder's obligation to sell the Shares and to take the other actions required to be taken by Shareholder at the Closing to consummate the transactions contemplated by this Agreement, is subject to fulfillment on, or prior to the Closing, of each of the following conditions (any of which may be waived by Shareholder in whole or in part to the extent permitted by applicable law):

9.1    <u>Accuracy of Representation</u>. All of Buyer's representations and warranties set forth in Article 5 of this Agreement, must be true and correct as of the date of this Agreement, and must be true and correct as of the Closing Date as if made on the Closing Date.

9.2    <u>Buyer's Performance</u>.  All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing must have been duly performed and complied with.  Each document required to be delivered pursuant to this Agreement must have been delivered, and each of the other covenants and obligations must have been performed and complied with in all respects.

9.3    <u>No Proceedings</u>. Since the date of this Agreement, there must not have been commenced or threatened against Buyer, or against any Person affiliated with Buyer, any Proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the contemplated transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the contemplated transactions.

9.4    <u>No Prohibition</u>.  Neither the consummation nor the performance of any of the contemplated transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable



Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise formally proposed by or before any Governmental Body.

9.5    Purchase Price.  The Buyer shall pay the Shareholder the Closing Cash Payment and execute and deliver the Shareholder Notes and any other deliverables as contemplated by the terms and conditions of this Agreement.

9.6    Filings; Consents.  All material registrations, filings, applications, notices, consents, approvals, orders, qualifications and waivers required to be made, filed, given or obtained with, to or from any Governmental Authorities in connection with consummating the transaction shall have been made filed, given or obtained.

## ARTICLE 10
## POST-CLOSING OBLIGATIONS

10.1    All representations and warranties contained in this Agreement shall survive the consummation of the transactions contemplated by this Agreement for a period of eighteen (18) months provided that the representations and warranties set forth in Sections 3.1 (Organization of Company)  3.8 (Taxes), 4.1 (Authority) and 4.3 (Ownership of Shares in Company) shall survive the Closing Date for the applicable statute of limitations, but in no event greater than five (5) years from the Closing Date.

10.2    Non-Competition.  As an inducement to Buyer to execute and deliver this Agreement and consummate the transactions contemplated hereby, Henry F. Kronfle and Manuel A. Kronfle shall each execute at closing an Agreement Not To Compete, in substantially the form attached hereto as Exhibit "A, which will provide that for a period of five (5) years from the later of the Closing Date, or the termination of the employment of Henry F. Kronfle or Manuel A. Kronfle with the Company for any reason, they will not, directly or indirectly, engage in, continue in, carry on or deliver the specific services provided by the Company within the state of Florida, including acting as an owner, employee, independent contractor, consultant or in any other capacity in any corporation, partnership, firm or other form of business organization which is so engaged, provided, however, that the following will not prohibit the passive ownership of securities of corporations which are listed on a national securities exchange or traded in the national over-the-counter market in an amount which will not exceed 5% of the outstanding shares of any such corporation.

10.3    Non-Solicitation.  Henry F. Kronfle and Manuel A. Kronfle , shall each execute at closing  an Agreement Not To Solicit in substantially the form attached hereto as Exhibit "A", which will provide that  Henry F. Kronfle and Manuel A. Kronfle  for a period of five (5) years from the later of  the Closing Date, or the termination of the employment of Henry F. Kronfle and Manuel A. Kronfle with the Company for any reason, they will not directly or indirectly contact or attempt to contact, solicit or attempt to solicit, or otherwise enter into or attempt to enter into (on Shareholder's or its officers and directors own behalf or on behalf of any other person or entity) any business relationship with any customer or of the Company, which is similar to the relationship which exists between the Company and its customers. For purposes of this Agreement, "Customer" shall mean any individual, partnership, corporation, or association, which was a customer of the

Company within the twelve (12) calendar months immediately preceding the Closing Date. Henry F. Kronfle and Manuel A. Kronfle shall further covenant, and agree that, while employed by the Company and for a period of twenty four (24) months following termination of employment with the Company for any reason, they shall not directly or indirectly induce, solicit, offer or recruit or attempt to induce any employee of the Company to apply for or accept employment with any other person or entity.

10.4    <u>Indemnification and Payment of Damages</u>.    Shareholder and Buyer (the "Indemnifying Party") covenant and agree to indemnify and hold harmless the other party and their respective representatives, stockholders, controlling persons, and affiliates (the "Indemnified Party") for and against, and will pay, or reimburse, the Indemnified Party the amount of, any loss, cost, liability, fine, claim, proceeding or damages, expense (including all reasonable fees and disbursements of counsel incurred in the investigation or defense of any of the same or in asserting any of their respective rights hereunder whether or not involving a third-party claim (collectively, "Damages"), arising, directly or indirectly, from or in connection with;

(a)    any of the following: (i) a breach of any representation in any material respect; (ii) a material exception to any representation set forth on the attached Disclosure Schedules; or (iii) any fundamental warranty or covenant made by the Indemnifying Party in this Agreement, the Exhibits, the supplements to the Exhibits, or any other material transaction document delivered by the Indemnifying Party pursuant to this Agreement;

(b)    the material breach of any failure of the Indemnifying Party to perform any covenant or agreement made in this Agreement or fulfill any obligation in respect thereof,

(c)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with the Indemnifying Party, or any Person acting on their behalf in connection with any of the contemplated transactions in this Agreement.

(d)    any liability of the Company relating to the operation of the business of the Company prior to the Closing, arising out of action taken, or specified events occurring prior to the Closing, including, but not limited to, any successor liability or responsible officer liability asserted against Purchaser (or its personnel or other representatives) for Taxes.

(e)    Shareholder agrees to pay, reimburse, indemnify, and hold harmless Buyer and its respective, officers, members, successors, and permitted assigns, from and against any and all Taxes imposed upon Shareholder or Company with respect to, and any and all other losses arising out of or in any manner incident, relating, or attributable to Taxes imposed upon Shareholder or Company with respect to, or Tax Returns required to be filed by Shareholder or Company with respect to, *(i)* any taxable year (or other applicable reporting period) (a Reporting Period) of Shareholder or Company ending on or before the Closing Date (Pre-closing Tax Period) other than losses arising from transactions occurring after the Closing; *(ii)* to any Reporting Period of Shareholder or Company that begins before the Closing Date and that ends after the Closing Date (a Straddle Period), except



that with respect to any Straddle Period, Shareholder shall be responsible for the payment of the Taxes only to the extent that they relate to the portion of the Straddle Period ending on the Closing Date and except with respect to any Reporting Period to the extent of any reserve on the Closing Balance Sheet relating to the Taxes; and *(iii)* any transfer taxes.

(f)     Buyer, its Members or Shareholders, and the Company agree to pay, reimburse, indemnify, and hold harmless Shareholder, and its respective, officers, members, successors, and permitted assigns, from and against any and all Taxes imposed upon Shareholder payable with respect to, and any and all other losses arising out of or in any manner incident, relating, or attributable to Taxes imposed upon Shareholder payable with respect to, or Tax Returns required to be filed by Shareholder with respect to, *(i)* any taxable year (or other applicable reporting period) (a Reporting Period) of Shareholder commencing on or after the Closing Date; *(ii)* to any Reporting Period of Shareholder that begins after the Closing Date and that ends after the Closing Date (a Straddle Period), except that with respect to any Straddle Period, Shareholder shall be responsible for the payment of the Taxes only to the extent that they relate to the portion of the Straddle Period ending on the Closing Date and except with respect to any Reporting Period to the extent of any reserve on the Closing Balance Sheet relating to the Taxes; and *(iii)* any transfer taxes.

(g)     notwithstanding the foregoing, Buyer as the Indemnified Party shall be entitled to indemnification pursuant to Section 10.4(a)-10.4(b) only when the aggregate amount of such Damages exceed $65,000 (the "Threshold"), at which point Buyer shall be entitled to recover the aggregate dollar amount of such Damages. Notwithstanding anything to the contrary contained in this Agreement, the maximum liability of Shareholder to Buyer under this Agreement, including indemnification, shall be $300,000.00 in the aggregate. The indemnification obligations of Shareholder under this Agreement shall expire six (6) months from the Closing Date.

10.5     Right of Set-off.  In the event Buyer has a valid claim for Indemnification in excess of the Threshold amount under Section 10.4 above, Buyer shall promptly notify the  Shareholder, in writing, of such claim. In the event Shareholder does not satisfy said claim or said claim is not disputed within twenty (20) days from the receipt of such notice, Buyer may, in consultation with Shareholder, pay such claim and receive full credit against the next payment(s) due under the Term Note, pursuant to this Agreement; The maximum aggregate amount of set-offs shall not exceed $100,000.00. With respect to any tax obligations owed by the Company which relate to the period of time prior to the Closing, the Buyer shall have the right to set-off all such tax obligations against the Term Note.  This right of set-off shall be incorporated into the Term Note.

10.6     Procedure for Indemnification -Third Party Claims.

(a)     Promptly, but not less than ten (10) days after receipt by the Indemnified Party of written notice of the commencement of any claim or legal proceeding by a person who is not a party to this Agreement ("Third Party Claim") against it in which it may have a right of indemnification under this Agreement, such Indemnified Party will give written

notice to the Indemnifying Party who owes such indemnification obligation of the commencement of such proceeding, including the amount of or estimate of the liability arising therefrom, if known. Failure to notify the Indemnifying Party will not relieve the Indemnifying Party of any liability that it may have to any Indemnified Party, except to the extent that the Indemnifying Party demonstrates that the defense of such action is prejudiced by the Indemnifying Party's failure to give such notice. Indemnifying Party shall acknowledge receipt of the notice to the Indemnified Party within thirty (10) days from receipt of notice and whether it intends to assume the defense of such Third Party Claim.

(b)     If any Proceeding is brought against the Indemnified Party and the Indemnified Party gives written notice to the Indemnifying Party of the commencement of such proceeding, the Indemnifying Party will, be entitled to participate in such proceeding and, to the extent that it wishes (unless (i) the Indemnifying Party is also a party to such proceeding and the Indemnified Party determines in good faith that joint representation would be inappropriate, or (ii) the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to (i) defend such proceeding and (ii) provide indemnification with respect to such proceeding), to assume the defense of such proceeding with counsel reasonably satisfactory to the Indemnified Party. After notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such proceeding, the Indemnifying Party will not, as long as it diligently conducts such defense, be liable to the Indemnified Party under this Section for any fees of other counsel or any other expenses with respect to the defense of such proceeding, subsequently incurred by the Indemnified Party in connection with the defense of such proceeding, other than reasonable costs of investigation. If the Indemnifying Party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (ii) no compromise or settlement of such claims may be effected by the Indemnifying Party without the Indemnified Party's consent unless the sole relief provided is monetary damages that are paid in full by the Indemnifying Party. If notice is given to an Indemnifying Party of the commencement of any Proceeding and the Indemnifying Party does not, within ten days after the Indemnified Party's notice is given, give notice to the Indemnified Party of its election to assume the defense of such Proceeding, the Indemnifying Party will be bound by any determination made in such Proceeding or any compromise or settlement effected in good faith by the Indemnified Party.

(c)     Notwithstanding the foregoing, if an Indemnified Party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the Indemnified Party may, by notice to the Indemnifying Party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the Indemnifying Party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld), nor shall the Indemnifying Party be responsible for the Indemnified Party's attorney's fees in such proceeding.

10.7    Procedure for Indemnification - Other Claims.    A claim for indemnification for any matter not involving a Third-Party Claim may be asserted by written notice to the party from whom indemnification is sought.

## ARTICLE 11
## TERMINATION

11.1    Termination of the Agreement.    The Parties may terminate this Agreement as provided below:

(a)    The Shareholder and Buyer may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)    Either Buyer or Shareholder may terminate this Agreement if a material breach of any fundamental covenant, representation or warranty contained in this Agreement has been committed by the other party and such breach has not been cured or waived prior to the Closing;

11.2    Effect of Termination. If this Agreement is terminated as permitted by Section 11.1, such termination shall be without liability of any party to this Agreement, except with respect to the Escrow Deposit or as otherwise stated in this Agreement.  If such termination shall result from the failure of any party to fulfill a material condition to the performance of the obligations of another party or to perform an agreement or covenant of this Agreement or from a material breach of any representation or warranty by any party to this Agreement, nothing herein shall relieve such party from such breach prior to Termination, subject to the terms of this Agreement. Notwithstanding the foregoing, this Section 11.2, the Mutual Confidentiality and Non-Disclosure obligations of the parties pursuant to that agreement executed on October 7, 2019, and Article 12, shall survive any termination of this Agreement.

## ARTICLE 12
## MISCELLANEOUS

12.1    Entire Agreement: Amendments and Waivers.    This Agreement, together with all Exhibits and Schedules attached hereto, constitutes the entire agreement between and among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. No modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof, nor shall any such waiver constitute a continuing waiver.

12.2    Notices.    Any notice or correspondence to be given hereunder shall be in writing and delivered personally or mailed by registered or certified mail, postage prepaid and return



receipt requested, by facsimile, or by recognized overnight business courier to the following addresses:

To Buyer:    Eusebio Paredes

To Shareholder:  Henry Kronfle

Each of the above addresses for notice purposes may be changed by providing appropriate notice hereunder. All notices shall be effective upon actual receipt. Any such notice or communication shall be deemed to have been received (i) when delivered, if personally delivered or transmitted by electronic mail, with receipt acknowledgment by the recipient by return electronic mail, (ii) on the next Business Day after dispatch, if sent by nationally recognized, overnight courier guaranteeing next Business Day delivery, and (iii) on the fifth (5th) Business Day following the date on which the piece of mail containing such communication is posted, if sent by mail.

12.3    Severability.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If a court of competent jurisdiction declares that any term or provision hereof is unenforceable, the parties agree that such court shall have the power to modify any unenforceable term or provision such that is enforceable and that comes closest to expressing the intention of the unenforceable term or provision, and this Agreement shall be enforceable as so modified.

12.4    No Merger.  Any provision of this Agreement which contemplates performance or the existence of obligations after the Closing Date shall not be deemed to be merged into or waived by the execution and delivery of this Agreement at the Closing, but shall survive Closing, subject to any limitations set forth in this Agreement.

12.5    Public Announcements.  The parties agree that no public release, announcement or any other disclosure concerning any of the transactions contemplated hereby shall be made or issued by any party without the prior written consent of Buyer and Shareholder (which consent shall not be unreasonably withheld or delayed).

12.6    Headings.  The descriptive headings in this Agreement are inserted for convenience only and do not constitute a part of this Agreement and shall not affect in any way the interpretation of this Agreement.

12.7    Binding Effect and Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

12.8    Jurisdiction.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Florida, County of Miami-Dade, or in the United States District Court for the Southern District of Florida, and each of the parties consents to the jurisdiction of such courts (and



of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.  As a condition precedent to the initiation of any action or proceeding described in the above paragraph, the party wishing to bring such action or proceeding shall first submit same to non-binding mediation under the rules of the American Arbitration Association for proceedings to be conducted in Miami-Dade County, Florida. The parties agree to proceed in good faith with such non-binding mediation proceedings and the prosecution of any action or proceeding as provided in the above paragraph shall be stayed until the expiration of 120 days from the date that such action or proceeding was first submitted to non-binding mediation as herein provided.

12.9    <u>Governing Law</u>. The provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida (excluding any conflict of law rule or principle that would refer to the laws of another jurisdiction).

12.10    <u>Attorneys' Fees</u>.  Except as otherwise provided in this Agreement, in the event any suit or other legal proceeding is brought for the enforcement of any of the provisions of this Agreement, the parties hereto agree that the prevailing party or parties shall be entitled to recover from the other party or parties reasonable attorneys' fees and costs through appeal.

12.11    <u>Costs and Expenses</u>.  Except as otherwise expressly provided elsewhere in this Agreement, each of the parties to this Agreement shall bear his or its own expenses incurred in connection with the negotiation, preparation, execution and closing of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

12.12    <u>Remedies</u>. The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy shall not preclude or constitute a waiver of the right to use any or all other rights or remedies. Such rights and remedies are given in addition to any other rights and remedies a party may have by law, statute, equity or otherwise.

12.13    <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

12.14    <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any party, upon any breach, default or noncompliance by another party under the Agreement or any other agreement or instrument delivered pursuant hereto shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of or in any similar breach, default or noncompliance thereafter occurring. Any waiver, permit, consent or approval of any kind or character on any party's part of any breach, default or noncompliance under the Agreement or any other agreement or instrument delivered pursuant hereto, or any waiver on such party's part of any provisions or conditions thereunder, must be in writing and shall be effective only to the extent specifically set forth in such writing.

12.15  Legal Representation.  The parties to this Agreement agree and acknowledge that they have been or have had an opportunity to be represented by competent counsel of their own choice and that this Agreement has been the product of negotiation among them.  Accordingly, the parties agree that in the event of any ambiguity in any provision of this Agreement, this Agreement shall not be construed against either party regardless of which party was responsible for the drafting thereof.

12.16  Counterparts.  This Agreement may be executed in one or more counterparts, including by facsimile or other electronic transmission, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.17  Expenses.  Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel, and accountants. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

12.18  Assigns, Successors, and No Third Party Rights.    Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, which will not be unreasonably withheld, except that Buyer may assign any of its rights under this Agreement to any corporation or limited liability company controlled by Eusebio Paredes. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

**ARTICLE 13**
**DEFINITIONS**

Capitalized terms used in this Agreement are used as defined in this Article 10 or elsewhere in this Agreement.

13.1  Affiliate: shall include, with respect to any person, (i) any spouse or blood relative of such person or such person's spouse, and (ii) any other person controlling, controlled by or under common control with such person. The term "control" means the power to direct or cause the direction of the management or policies of such person.

13.2  Assets: shall mean all of the assets, rights and properties used or useful by Company in the operation of the Business.

13.3  Code: shall mean the Internal Revenue Code of 1986, as amended.  All references to the Code or to the regulations promulgated thereunder shall include any amendments or substitute or successor provisions thereto.

13.4    Contracts: shall mean any and all contracts, agreements, understandings, arrangements, leases, licenses, registrations, authorizations, bonds, notes, guaranties, liens, indebtedness, approvals or other instruments or undertakings to which a person is a party or to which or by which a person or the property of such person is subject or bound.

13.5    Damages: shall mean any and all liabilities, obligations, penalties, fines, judgments, claims, losses, costs, expenses, assessments, taxes, interest, penalties and attorneys' and accountants' fees.

13.6    Environmental Law: shall mean any federal, state, local or foreign law, regulation, treaty, order, decree, permit, authorization, policy, opinion, common law or agency requirement applicable to the Company relating to: (a) the protection, investigation or restoration of the environment, health and safety, or natural resources or exposure to any harmful or hazardous material, (b) the handling, use, presence, disposal, release or threatened release of any chemical substance or waste water, or (c) noise, odor, wetlands, pollution, contamination or any injury or threat of injury to persons or property, including, without limitations the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act, the Occupational and Safety and Health Act, Clean Water Act and the Oil Pollution Act.

13.7    Financial Statements: shall mean any or all of the unaudited financial statements, including balance sheets and related statements of income and statements of changes in financial position and the accompanying notes thereto, of Company's business prepared in accordance with GAAP consistently applied, except as may be otherwise provided therein.

13.8    GAAP: shall mean United States generally accepted accounting principles.

13.9    Governmental Authorities: shall mean any government, governmental or regulatory authority or body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency, including but not limited to courts, arbitrators, tribunals, departments, commissions, boards, bureaus, ministries or other instrumentalities, including private entities acting under contract with any of the foregoing.

13.10    Hazardous Substance: shall mean any substance that is: (a) listed, classified or regulated in any concentration pursuant to any Environmental Law, (b) any petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, radioactive materials or radon, or (c) any other substance which may be the subject of regulatory action by any Governmental Authority pursuant to any applicable Environmental Law.

13.11    Knowledge: or similar words shall mean, with respect to Shareholder, the actual knowledge of the Shareholder Manager after reasonable inquiry.

13.12    Legal Requirements: shall mean any and all laws (statutory, judicial or otherwise), ordinances, regulations, judgments, orders, directives, interpretative policies and/or manuals, injunctions, writs, decrees or awards of, and any Contracts with, any Governmental Authority, in



each case as and to the extent applicable to a person or such person's business, operations or properties.

13.13    Permits: shall mean any and all permits, licenses, legal status, orders, registrations, applications, Contracts or other authorizations under any Legal Requirement or otherwise granted by any Governmental Authority, including without limitation, all permits and liens necessary for the operation of the Company's Business.

13.14    Person: shall mean an individual, corporation, partnership, limited liability company, trust or unincorporated organization or a government or any agency or political subdivision thereof, or any other entity.

13.15    Tax or Taxes: shall mean all taxes, including (a) all federal, state or local income or franchise taxes; (b) all gross receipts, ad valorem, value-added, goods and services, excise, real property, personal property, sales, use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental (including Taxes under Code section 59A), workers compensation, profits, license, lease, service, service use, severance, stamp, occupation, windfall profits, customs, duties, franchise, net worth, commercial profits and other taxes imposed by the United States of America or any state or local government, or any agency thereof, or other political subdivision of the United States or any such government; (c) any interest, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any items listed above; and (d) any liability in respect of any items described above payable by reason of contract, assumption, transferee liability, operation of law.

13.16    Tax Return: shall mean any and all returns and reports, including without limitation, information and withholding returns and reports of or relating to any Tax relating to the Company.

13.17    Waiver of Jury Trial: Each party acknowledges and agrees that any controversy which may arise under this agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury in respect of any litigation directly or indirectly arising out of or relating to this agreement or the transactions contemplated by this agreement each party certifies and acknowledges that (i) no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) each such party understands and has considered the implications of this waiver, (iii) each such party makes this waiver voluntarily, and (iv) each such party has been induced to enter into this agreement by, among other things, the waivers and certifications in this section.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]
[SIGNATURES ON FOLLOWING PAGE]



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**BUYER:**

BES Associates, Corp and/or assigns ("Buyer"), a Florida corporation

By: _____
     Eusebio Paredes, President

**SHAREHOLDER:**

Manuhen Enterprises LLC, a Florida limited liability company

By: _____
     Manuel Antonio Kronfle, Manager

**THE COMPANY:**

RC Home Showcase, Inc. a Florida corporation

By: _____
     Henry F. Kronfle, President

## PROMISSORY NOTE

$2,970,000.00

January 13, 2021

Miami, Florida

**FOR VALUE RECEIVED**, BES INTERNATIONAL, INC., a Delaware corporation, and RC Home Showcase, Inc., a Florida Corporation (collectively the "Company" or "Debtor"), hereby promise to pay to the order of **MANUHEN ENTERPRISES, LLC**, and its successors and/or assigns (collectively, the "Holder"), at the Holder's address 2103 Coral Way, Suite 800, Miami, FL 33145, or such other place as the Holder may from time to time designate in writing, the principal sum of Two Million Nine Hundred Seventy Thousand Dollars (US$2,970,00.00) (the "Balloon Note"), in lawful money of the United States of America, and to pay interest on the unpaid principal balance thereof in like money at such address from the date hereof until the date when the principal balance shall have been paid in full at a rate of four percent (4%) per annum.  Accrued and unpaid interest on the unpaid principal balance hereof shall be payable monthly in arrears on the same day of each month, commencing February 12, 2021. Interest on this Balloon Note shall be computed on the actual number of days elapsed over a 365-day year (i.e., $1/365^{th}$ of a full year's interest shall accrue for each day any amount evidenced by this Balloon Note is outstanding).

The principal balance of  $2,970,000.00, together with accrued but unpaid interest, shall be amortized over 25 years and shall be payable in eleven (11) consecutive monthly installments each in the amount of $15,676.75 commencing on February 12, 2021, and continuing thereafter on the same day of each succeeding month, except where indicated, with a final payment of the unpaid outstanding principal, together with accrued but unpaid interest, due in the form of a balloon payment on the first anniversary of this Balloon Note.

Payments of principal and interest hereunder shall be made at such place as the Holder may designate and shall be in immediately available funds in lawful money of the United States. This Balloon Note may be prepaid at any time in whole or in part without premium or penalty. All payments in respect of this Balloon Note shall be applied first to accrued interest and then to principal outstanding hereunder.

This Balloon Note is subject to the following terms and conditions:

1.      **Stock Purchase Agreement**.  This Balloon Note is the "Balloon Note" issued pursuant to that certain Amended Stock Purchase Agreement, dated as of December 22, 2020 (the "Agreement"), by and between the Company and the Holder. Capitalized terms used herein and not otherwise defined shall have those meanings given to them in the Agreement.

2.      **Security Agreement and Personal Guaranty**.  In consideration of and as an inducement to Holder to enter into the Agreement and accept from the Company this Balloon Note, Holder and the Company, as Debtor, have entered into a Security Agreement of even date hereof (the "Security Agreement") whereby Debtor has granted Holder a first and continuing security interest (the "Security Interest") in certain assets of the Company as identified in the Security Agreement, together with (a) a Personal Guaranty executed by the Company's sole Shareholder, Eusebio Paredes, of even date hereof, further securing this Balloon Note, and (b) a life insurance policy naming Holder as the beneficiary, pursuant to the provisions of Section 1.2(d) of the Agreement.

3.      **Covenants**.  The Company covenants and agrees that the Company will punctually pay or cause to be paid the principal and interest on this Balloon Note at the dates and places and in the manner specified herein in lawful money of the United States of America in same day funds, without setoff,

-1-

Company _____
Holder _____





Exhibit B

counterclaim or deduction of any kind. The Company agrees, upon the request of Holder, to pay all taxes including without limitation documentary stamps, interest and penalty, duties and other charges related to this Balloon Note and payment hereunder (other than taxes on or measured by net income of the Holder), in addition to the principal and interest evidenced by this Balloon Note.

4.    **Maturity**. The principal amount of this Balloon Note, together with accrued but unpaid interest, shall be due and payable as follows:

(a)    $15,676.75, together with any accrued but unpaid interest, shall be paid by the Company to Holder on February 12, 2021; and

(b)    $15,676.75, together with any accrued but unpaid interest, shall be paid by the Company to Holder on March 12, 2021; and

(c)    $15,676.75, together with any accrued but unpaid interest, shall be paid by the Company to Holder on April 12, 2021; and

(d)    $15,676.75, together with any accrued but unpaid interest, shall be paid by the Company to Holder on May 12, 2021; and

(e)    $15,676.75, together with any accrued but unpaid interest, shall be paid by the Company to Holder on June 12, 2021; and

(f)    $15,676.75, together with any accrued but unpaid interest, shall be paid by the Company to Holder on July 12, 2021; and

(g)    $15,676.75, together with any accrued but unpaid interest, shall be paid by the Company to Holder on August 12, 2021; and

(h)    $15,676.75, together with any accrued but unpaid principal and interest, shall be paid by the Company to Holder on or before September 12, 2021; and

(i)    $15,676.75, together with any accrued but unpaid principal and interest, shall be paid by the Company to Holder on or before October 12, 2021; and

(j)    $15,676.75, together with any accrued but unpaid principal and interest, shall be paid by the Company to Holder on or before November 12, 2021; and

(k)    $15,676.75, together with any accrued but unpaid principal and interest, shall be paid by the Company to Holder on or before December 12, 2021; and

(l)    All unpaid outstanding principal and accrued but unpaid interest shall be paid by the Company to Holder in full on, or before January 12, 2022.

5.    **Default**.

-2-

Company _____
Holder _____



a. **Default.** The occurrence of any one or more of the following events shall constitute an event of default (each an "Event of Default") hereunder:

(i) if the Company fails to make payment in full of any principal or interest payable with respect to this Balloon Note within five (5) business days, on the date when due hereunder;

(ii) if at any time during the twelve (12) month period from the date hereof through the date this Balloon Note is paid in full, the Company transfers or assigns any portion of the Company Shares and/or assets of the Business to a successor entity or assignee that is not wholly owned by Eusebio Paredes in accordance with Section 1.2(d) of the Agreement;

(iii) if the Company becomes insolvent (however defined or evidenced) or makes an assignment for the benefit of creditors;

(iv) if there shall be filed by or against the Company any petition for any relief under the bankruptcy laws of the United States now or hereafter in effect or any proceeding shall be commenced with respect to the Company under any insolvency, readjustment of debt, reorganization, dissolution, liquidation or similar law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity), provided that in the case of any involuntary filing or the commencement of any involuntary proceeding against the Company such proceeding or petition shall have continued undismissed and unvacated for at least 60 days;

(v) if any petition or application to any court or tribunal, at law or in equity, shall be filed by or against the Company for the appointment of any receiver or trustee for the Company or any material part of the property of the Company, provided that in the case of any involuntary filing against the Company, such proceeding or appointment shall have continued undismissed and unvacated for at least 60 days;

(vi) the occurrence of a default or event of default under the Security Agreement, after the expiration of the applicable cure period, securing this Balloon Note; or

(vii) the dissolution of the Company (whether voluntarily or otherwise) or the merger, consolidation or reorganization of the Company without the prior written consent of the Holder, which consent may be arbitrarily withheld;

b. **Notice of Event of Default.** Upon the President, Vice President, Secretary or Treasurer (each a "Responsible Officer") of the Company acquiring knowledge of the existence of an Event of Default, the Company shall send to the Holder a written notice (the "Notice of Event of Default") specifying the nature and period of existence of any Event of Default and what action the Company is taking or proposes to take with respect thereto.

c. **Remedies Upon Default.** If any Event of Default shall occur for any reason, then and in any such event, in addition to all rights and remedies of the Holder under applicable law or otherwise,

-3-

Company _____
Holder _____



all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively and concurrently, the Holder may, at its option, declare any or all amounts owing under this Balloon Note, to be due and payable, whereupon the then unpaid balance hereof shall forthwith become due and payable, together with interest accruing thereafter at the lower of (i) eighteen percent (18.0%) per annum or (ii) the highest rate of interest allowed by Florida law. The indebtedness evidenced by this Balloon Note is secured by the Security Agreement, creating legal and valid encumbrances on and an assignment of all of the Company's interest in the Collateral, which Security Agreement is incorporated by reference herein. Holder shall have such rights with respect to the Collateral as is authorized by applicable law.

6.    **Other Matters**.

a.    **Prepayments**. This Balloon Note may be prepaid in whole or in part at any time without premium or penalty of any kind. Time is of the essence to all terms and provisions set forth herein.

b.    **Severability**. If any provision of this Balloon Note is invalid, illegal, or unenforceable, the balance of this Balloon Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances. The rate of interest on this Balloon Note is subject to any limitations imposed by applicable usury laws.

c.    **Headings**. The headings in this Balloon Note are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Balloon Note.

d.    **Governing Law; Venue.** This Balloon Note shall be governed by and construed in all respects under the laws of the State of Florida, without reference to its conflict of laws rules or principles. The Holder, the Company, and any endorsers, sureties, guarantors and all others who are, or who may become, liable for the payment of the sums due hereunder severally, irrevocably and unconditionally (a) agree that any suit, action, or other legal proceeding arising out of or relating to this Balloon Note shall be brought, at the option of the Holder, in a court of record of the State of Florida in Miami-Dade County.

e.    **Waiver.** The rights and remedies of Holder as provided in this Balloon Note may be pursued against the Company, and any funds, property and security held by Holder for the payment hereof or otherwise at the sole discretion of Holder. The failure to exercise any right or remedy shall in no event be construed as a waiver or release of said right or remedy or of the right to exercise them at any later time. None of the terms or provisions of this Balloon Note may be waived, altered, modified or amended except as the Holder may consent thereto in writing, and then only to the extent and for the period of time expressly stated therein.

f.    **Presentment.** The Company waives diligence, presentment, protest and demand, and also notice of protest, of demand, of nonpayment, of dishonor and of maturity and also recourse to suretyship defenses generally. Further, the Company hereby consents to any and all renewals, extensions or modifications of the terms hereof, including time for payment, and further agree that any such renewal, extension or modification of the terms hereof or the release or substitution of any security for the indebtedness evidenced hereby or any other indulgences shall not affect the liability of the Company for the indebtedness evidenced by this Balloon Note.

-4-

Company _____
Holder _____



g.    **Attorneys' Fees.**  The Company agrees to pay reasonable attorneys' fees and costs of collection if an attorney is retained by the Holder of this Balloon Note to secure collection hereof, whether or not litigation is required, and if litigation is required, such reasonable attorneys' fees and costs at all trial and appellate levels and/or in all post-judgment proceedings. All such amounts shall become immediately due and payable, shall bear interest at the rate provided for hereunder from the date incurred until paid and shall become additional indebtedness evidenced by this Balloon Note.

h.    **Successors and Assigns.**  Whenever used herein, the words "Company" and "Holder" shall be deemed to include their respective heirs, legal representatives, successors, assigns and successors in interest. The Company may not assign or delegate any rights or obligations hereunder without the prior written consent of Holder.

i.    **Usury.**  It is the intention of the parties hereto to comply with all applicable usury laws; accordingly, it is agreed that notwithstanding any provisions to the contrary in this Note or the Security Agreement securing this Balloon Note, in no event shall this Balloon Note require the payment or permit the collection of interest in excess of the maximum amount permitted by such laws. If any such excess of interest is contracted for, charged or received under this Balloon Note, or in the event the maturity of the indebtedness evidenced hereby is accelerated in whole or in part, or in the event that all or part of the principal or interest of this Balloon Note shall be prepaid, so that under any of such circumstances the amount of interest contracted for, charged or received under this Balloon Note shall exceed the maximum amount of interest permitted by the applicable usury laws, then in any such event, (a) the provisions of this paragraph shall govern or control, (b) neither the Company nor any other person or entity now or hereafter liable for the payment of this Balloon Note shall be obligated to pay the amount of such interest to the extent that is in excess of the maximum amount of interest permitted by the applicable usury laws, (c) any such excess which may have been collected shall be either applied as a credit against the then unpaid principal amount hereof or refunded to the Company, at the Holder's option, and (d) the effective rate of interest for this Balloon Note shall be automatically reduced to the maximum lawful rate allowed for this Balloon Note under the applicable usury jurisdiction thereof.

THE COMPANY, BY EXECUTION HEREOF, AND THE HOLDER, BY ACCEPTANCE HEREOF, MUTUALLY AND WILLINGLY WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY AND ALL CLAIMS MADE BETWEEN THEM WHETHER NOW EXISTING OR ARISING IN THE FUTURE, INCLUDING WITHOUT LIMITATION, ANY AND ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSS CLAIMS, THIRD PARTY CLAIMS AND INTERVENOR'S CLAIMS WHETHER ARISING FROM OR RELATED TO THE NEGOTIATION, EXECUTION AND PERFORMANCE OF THE TRANSACTIONS TO WHICH THIS BALLOON NOTE RELATES.

**IN WITNESS WHEREOF,** the Company has caused this Balloon Note to be executed on its behalf by the undersigned thereunto duly authorized.

BES INTERNATIONAL, INC.

By: 

_President_

-5-

Company _____
Holder _____

RC HOME SHOWCASE, INC.

By: _____

*President.*

-6-

Company _____
Holder _____

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is made and entered into as of this 13th day of January 2021, by and among, **MANUHEN ENTERPRISES, LLC** (referred to herein as the "Secured Party"), and **BES INTERNATIONAL, INC.**, a Delaware corporation, and **RC HOME SHOWCASE, INC.**, a Florida corporation (collectively the "Debtor").

## WITNESSETH

In consideration of the mutual covenants contained herein and other good and valuable consideration, the parties hereto agree as follows:

1.     The Collateral. In consideration of and as an inducement to Secured Party to enter into that certain Amended stock Purchase Agreement dated as of December 22, 2020 ("Stock Purchase Agreement") and accept from the Debtor that certain Balloon Promissory Note of even date hereof in the original principal amount of $2,970,000.00 (the "Balloon Note"), the Debtor hereby grants the Secured Party a first and continuing security interest (the "Security Interest") in the acquired Shares and Assets identified in Exhibit A hereto, together with all proceeds of the foregoing, including, without limitation, all general intangibles relating to or arising from the Assets, all cash and non-cash proceeds, income, profits, and benefits resulting from any of the foregoing, and, to the extent not otherwise included, all payments under insurance (whether or not the Secured Party is the loss payee thereof), or any indemnity, warranty, or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing, and together with all products, replacements, additions, betterments, extensions, renewals and accessions of any of the foregoing (the "Collateral").

2.     The Obligations. This Agreement is being executed and delivered in connection with the Debtor's obligations pursuant to the Stock Purchase Agreement and Debtor's contemporaneous execution and delivery of that certain Balloon Note. The Security Interest herein granted shall secure full and prompt payment and performance of all of the Debtor's obligations to Secured Party under the Balloon Note, whether direct or indirect, contingent or absolute, now or hereafter due or owing to Secured Party from Debtor by reason of the Balloon Note, and any and all renewals thereof (collectively, the "Obligations").

3.     Representations and Warranties of the Debtor. The Debtor represents and warrants, and so long as the Obligations remain unpaid, the Debtor shall be deemed continuously to represent and warrant, that:

(a)     No Prior Interests on Collateral. The Debtor is the owner of the Collateral free from any lien, encumbrance or other right, title or interest of any person or entity, except for the security interest in favor of the Secured Party created hereby, and Debtor will defend the Collateral against the claims and demands of all persons at any time claiming the same or any interest therein and affirms that no financing statements covering the Collateral and its proceeds are on file in any public office, except for the security interests in favor of Secured Party and those liens on file as of the Closing Date in any public office, and there is and shall be no adverse lien, security interest or encumbrance on or in the Collateral. Upon execution of this Agreement, the Debtor shall deliver such documents and endorsements in favor of the Secured Party as are required to show that the Collateral has been collaterally assigned to the Secured Party under this Agreement. The Debtor will not, without the prior written consent of the Secured Party, sell, pledge, assign or otherwise dispose of any of the Collateral, except in the ordinary course of business, or permit any setoff, lien or security interest to exist thereon except to the Secured Party.

(b)     Company Existence. The Debtor (a) is a corporation duly organized, validly existing and in good standing under the laws of Florida and/or Delaware; (b) has all requisite company



Exhibit C

power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted; and (c) has qualified to do business in all jurisdictions in which the nature of the Debtor's business requires that the Debtor be qualified.

(c)    Absence of Conflicts. The execution, delivery and performance by the Debtor of this Agreement will not (a) violate any provision of any existing law or regulation, or any judgment, order or award of any court, arbitrator or governmental authority; (b) violate any provision of the Debtor's articles of incorporation; (c) violate, be in conflict with, result in a breach of or constitute a default under any agreement or instrument to which the Debtor is a party or by which the Debtor or any of its properties may be bound; or (d) result in the creation or imposition of any security interest, lien, charge or encumbrance of any nature whatsoever upon the property or assets of the Debtor (except as created hereby).

(d)    Company Power; Authorization; Enforceable Obligations. The Debtor has all necessary company power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by the Debtor of this Agreement has been duly authorized by all necessary company action on the part of the Debtor; and, this Agreement has been duly and validly executed and delivered by the Debtor and constitutes the legal, valid and binding obligation of the Debtor, enforceable in accordance with its terms, except to the extent that enforceability hereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by principles of equity regarding the availability of remedies.

4.    Covenants of the Debtor. So long as the Obligations remain unpaid the Debtor will perform and observe each of its covenants to the Secured Party as set forth herein, and (a) will defend the Collateral against the claims and demands of all other parties; (b) will keep the Collateral free from all security interests or other encumbrances except the Security Interest; (c) will, upon demand, deliver to the Secured Party any documents relating to the Collateral or any part thereof, and any and all other schedules, documents and statements which the Secured Party may from time to time reasonably request; (d) will notify the Secured Party promptly in writing of any change in the Debtor's address specified above; (e) without the Secured Party's written consent will not make or agree to make any alteration or modification to the Collateral or permit anything to be done that may impair the value of the Collateral or the security intended to be afforded by this Agreement; (f) will keep and maintain the Collateral in good order and repair at all times; (g) until this Agreement is terminated, the Collateral shall be insured by Debtor at its expense against all risk to which it is exposed, including fire, theft and windstorm; (h) will promptly pay all taxes as they become due on the Collateral; and  shall not (i) permit any liens or security interests (other than those permitted by this Agreement) to attach to any of the Collateral, (ii) permit any of the Collateral to be levied upon under legal process or be subject to any unpaid charge, including taxes, (iii) sell, transfer, lease or otherwise dispose of any of the Collateral or any interest therein, or offer to do so, except in the ordinary course of business, without the prior written consent of Secured Party, or (iv) permit anything to be done that may impair the value of any of the Collateral or the security intended to be afforded by this Agreement.

5.    Events of Default. Debtor shall be in default (each, an "Event of Default") under this Agreement upon the happening of any one or more of the following events, circumstances or conditions, to wit: (i) an Event of Default shall occur as specified in the Balloon Note; (ii) failure by Debtor to comply with or perform any provision of this Agreement on its part to be complied with or performed for a period of seven (7) days after Debtor's receipt of written notice of such failure from Secured Party; (iii) any material representations or warranties made or given, or to be made or given, by Debtor in this Agreement or in the Balloon Note, shall have been incorrect, false or misleading in any material respect when made; or (iv) subjection of the Collateral, or any part thereof, to attachment, charging order, garnishment, levy of execution or other judicial process, or if any involuntary lien or encumbrance shall be filed against any portion of the Collateral. If any Event of Default shall occur and be continuing the Secured Party may, at

- 2 -



its option, by notice in writing to the Debtor, declare all of the Obligations to be immediately due and payable, together with interest accrued thereon in accordance with the Balloon Note.

6.    <u>Remedies</u>.  Upon the happening of any Event of Default:

(a)    The Secured Party's rights with respect to the Collateral shall be those of a secured party under the Florida Uniform Commercial Code as now in effect or hereinafter amended.  The Secured Party shall also have any additional rights granted herein.  If requested by the Secured Party the Debtor will immediately make the Collateral available to the Secured Party at a place to be designated by the Secured Party.  Secured Party, at its option, may enter upon Debtor's premises peaceably by Secured Party's own means or with legal process and take possession of the Collateral (and any books, records, files, papers, information and other data pertaining thereto), or render it immobile, or dispose of the Collateral on Debtor's premises and Debtor agrees not to resist or interfere.

(b)    The Secured Party shall have the right, at its option, to demand, collect and sue for all proceeds from the Collateral (either in the Debtor's name or the Secured Party's name at the latter's option) with the right to enforce, compromise, settle or discharge any such proceeds.  The Debtor appoints the Secured Party the Debtor's attorney-in-fact to endorse the Debtor's name on all checks, commercial paper and other instruments pertaining to the proceeds, after any Event of Default.

(c)    The Debtor agrees that any notice by the Secured Party of the sale or disposition of the Collateral or any other intended action hereunder, whether required by the Florida Uniform Commercial Code or otherwise, shall constitute reasonable notice to the Debtor if the notice is mailed by regular or certified mail, postage prepaid, at least seven (7) days before the action to the Debtor's address as specified in this Agreement or to any other address which the Debtor has specified in writing to the Secured Party as the address to which notices shall be given to the Debtor.  The Debtor further agrees that the Secured Party may be the purchaser of the Collateral at any public or private sale.

(d)    The Debtor shall pay all costs and expenses incurred by the Secured Party in enforcing this Agreement, realizing upon any Collateral and collecting any Obligations, including reasonable attorney's fees whether suit is brought or not and whether incurred in connection with collection, trial, appeal or otherwise.

(e)    All of the rights, powers, remedies and privileges of Secured Party in the Event of Default, as provided under this Agreement and under applicable law, including, but not limited to, the Uniform Commercial Code, shall be cumulative and in addition one to the other, and in addition to those rights, powers, remedies and privileges afforded Secured Party under the provisions of this Agreement or the Note, and such rights, powers, remedies and privileges may be exercised singly or concurrently on one or more occasions.

(f)    If, at any time, in the opinion of Secured Party, a receivership may be necessary to protect the Collateral, whether before or after maturity of the indebtedness hereby secured, or at any time, or after the institution of suit to collect such indebtedness or enforce this Agreement, the Secured Party shall have the right to appointment, on ex parte application, and without notice to anyone, by any court having jurisdiction, of a receiver to take charge of the Collateral.

7.    <u>Miscellaneous</u>.

(a)    The Debtor authorizes the Secured Party at the Debtor's expense to file any financing statement or other documents or statements relating to the Collateral (without the Debtor's signature thereon) which the Secured Party deems appropriate, and the Debtor appoints the Secured Party

- 3 -



as the Debtor's attorney-in-fact to execute any such financing statement or statements in the Debtor's name and to perform all other acts which the Secured Party deems appropriate to perfect and to continue perfection of the Security Interest.

(b) After any Event of Default, the Secured Party may notify any party obligated to pay proceeds, of the existence of the Secured Interest and may also direct them to make payments of all proceeds to the Secured Party.

(c) No delay or omission by the Secured Party in exercising any right hereunder or with respect to any Obligations shall operate as a waiver of that or any other right, and no single or partial exercise of any right shall preclude the Secured Party from any other or future exercise of the right or the exercise of any other right or remedy. The Secured Party may cure any Event of Default by the Debtor in any reasonable manner without waiving the Event of Default so cured and without waiving any other prior or subsequent default by the Debtor. All rights and remedies of the Secured Party under this Agreement and under the Florida Uniform Commercial Code shall be deemed cumulative.

(d) The Secured Party shall have no obligation to take and the Debtor shall have the sole responsibility for taking any steps to preserve rights against all prior parties to the Collateral.

(e) The rights and benefits of the Secured Party under this Agreement shall, if the Secured Party agrees, inure to any party acquiring an interest in the Obligations or any part thereof.

(f) At its option, the Secured Party may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral. The Debtor shall reimburse the Secured Party on demand for any such payments made or expenses incurred by the Secured Party.

(g) The terms "the Secured Party" and "the Debtor" as used in this Agreement include the heirs, personal representatives, and successors or assigns of those parties, as applicable.

(h) This Agreement may not be modified or amended nor shall any provision of it be waived except in a writing signed by the Debtor and by an authorized officer of the Secured Party.

(i) This Agreement shall be construed under the Florida Uniform Commercial Code and any other applicable Florida laws in effect from time to time.

(j) The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the remaining provisions.

(k) All sections and descriptive headings in this Agreement are inserted for convenience only, and shall not affect the construction or interpretation hereof.

(l) This Agreement is a continuing agreement which shall remain in force and effect until all of the Obligations and any extensions or renewals, together with all interest thereon, shall be paid in full.

(m) **JURY WAIVER. THE SECURED PARTY AND THE DEBTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREIN, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR**

- 4 -



ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.

(n)     With respect to any legal action or proceeding arising under this Agreement or concerning the Collateral, the Debtor and the Secured Party, to the fullest extent permitted by law, hereby: (a) submits to the jurisdiction of the state and federal courts in the State of Florida; (b) agrees that the venue of any such action or proceeding may be laid in Miami-Dade County, Florida (in addition to any county in which any of the Collateral is located) and waives any claim that the same is an inconvenient forum; (c) stipulates that service of process in any such action or proceeding shall be properly made if mailed by any form of registered or certified mail (airmail if international), postage prepaid, to the address then registered in Secured Party's records for the Debtor, and that any process so served shall be effective ten days after mailing; (d) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts; (e) waives trial by jury; and (f) waives any right to interpose any set-off or non-compulsory counterclaim or to plead laches or any statute of limitations as a defense in any such action or proceeding, and waives all provisions and requirements of law for the benefit of Debtor now or hereafter in force.  No provision of this Agreement shall limit Secured Party's right to serve legal process in any other manner permitted by law or to bring any such action or proceeding in any other competent jurisdiction.

(o)     Time is of the essence with respect to the provisions of this Agreement.

(p)     Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

*[Remainder of page intentionally left blank.]*



**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Security Agreement as of the date first written above.

**DEBTOR:**

**BES INTERNATIONAL, INC.**

By: _____

Eusebio Paredes, President

**RC HOME SHOWCASE, INC.**

By: _____

Eusebio Paredes, President

Witnesses

Gabriel Paredes

MARIO R PEREZ

**SECURED PARTY:**

**MANUHEN ENTERPRISES, LLC**

By: _____

Manuel A. Kronfle, Manager

Claudio Reyes

STATE OF FLORIDA            )
                           ) SS:
COUNTY OF MIAMI-DADE    )

The foregoing instrument was acknowledged before me this 14th day of January 2021, by Eusebio Paredes, as the President of BES International, Inc., a Delaware corporation and RC Home Showcase, Inc., on behalf of each such entity. He/ is personally known to me or produced FDL as identification.

_____

Print Name: _____

NOTARY PUBLIC

My Commission Expires:

MARIA M. GARCIA
Commission # GG 168915
Expires April 16, 2022
Bonded Thru Budget Notary Services

- 6 -

STATE OF FLORIDA        )
                        ) SS:
COUNTY OF MIAMI-DADE    )

      The foregoing instrument was acknowledged before me this _17_ day of January 2021, by Manuel A. Kronfle as Manager of Manuhen Enterprises, LLC. He is personally known to me or produced _____ as identification.

Print Name: _Pedro A. Ariz_

NOTARY PUBLIC

PEDRO A. ARIZ
MY COMMISSION # GG164470
EXPIRES: November 30, 2021

**Exhibit A**

**COLLATERAL**

(a)     All of RC Home Showcase, Inc.'s accounts, accounts receivable, contract rights, and general intangibles, including, without limitation, all forms of payment, all present and future incomes, rents, revenues, issues and profits, goodwill, licenses and license rights, bailment or leasehold interests, whether as lessor or lessee, all choses in action and recoveries for any loss in value of the real estate of Debtor or items of property described in this Agreement, all rights of Debtor as an unpaid seller of goods and services (including, but not limited to, the rights of stoppage in transit, replevin, reclamation, and resale), rights in and to security agreements and other contracts or assignments providing security to Debtor, book debts, credits, indemnities, warranties or guarantees payable to Debtor on loss or damage of property, inventions, designs, design registrations, trademarks, trade styles, trade names, know-how, powers, privileges, logos, franchise rights, payments in kind, advertising and promotional materials, trade secrets, patents, patent rights, copyrights, patent applications, tax refunds, customer lists, business and accounting records, including all ledger account cards, computer tapes and disks and other computer information, in all cases whether now owned or hereafter created or acquired by Debtor or in which Debtor may now have or may after the date of this Agreement acquire an interest;

(b)     All inventory, including, without limitation, all goods held for sale or lease, finished goods, merchandise, parts, supplies, raw materials, and work-in-process of every kind and description, and all products thereof, whether now owned or acquired by Debtor after the date of this Agreement, or in which Debtor may now have or may after the date of this Agreement acquire an interest, including, without limitation, inventory temporarily out of Debtor's custody or possession and any returns or repossessions on any sales or accounts;

(c)     All goods, including, without limitation, equipment, machinery, materials, furniture, furnishings, engines, appliances, fixtures, tools, parts, supplies, and vehicles of every kind and description, whether now owned or acquired by Debtor after the date of this Agreement or delivered to the real property of Debtor, or in which Debtor may now have or may after the date of this Agreement acquire an interest, and all additions, accessions, replacements, substitutions, and improvements to such goods and wherever located;

(d)     All documents, documents of title, deposit accounts, negotiable and nonnegotiable instruments, shares, stocks, bonds, debentures, securities, moneys, sources of money, uncalled capital, letters of credit, investment property, and chattel paper whether now owned or acquired after the date of this Agreement by Debtor;

(e)     All instruments, documents, securities, monies, and property in which Debtor has or hereafter acquires rights which now or hereafter are at any time in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Secured Party had conditionally released the same; and

(f)     All proceeds and products of any of the personal property described above, in any form, including, without limitation, proceeds of any insurance relating to such collateral or fire and

- 8 -

builder's risk insurance and unrenewed insurance premiums; proceeds consisting of any of the above types of collateral; all awards made in eminent domain proceedings or purchased in lieu of such eminent domain proceedings; proceeds of any noncommercial tort cause of action in existence, now or after the date of this Agreement; and all replacements, substitutions, renewals, returns, additions, accessions, rents, royalties, issues, documents of ownership, and receipts for any of the foregoing.

## UNCONDITIONAL AND IRREVOCABLE
## GUARANTY OF PAYMENT

DATE:              January 13, 2021.

DEBTOR:            **BES INTERNATIONAL, INC.,** a Delaware corporation and **RC HOME SHOWCASE, INC.,** a Florida corporation.

HOLDER:            **MANUHEN ENTERPRISES, LLC**

NOTE:              That certain Promissory Note ("Balloon Note") of even date herewith executed by Debtor in favor of Holder in the principal amount of **TWO MILLION NINE HUNDRED SEVENTY THOUSAND DOLLARS ($2,970,000.00)**.

SECURITY
AGREEMENT:         That certain Security Agreement ("Security Agreement") of even date herewith executed by **BES INTERNATIONAL, INC., AND RC HOME SHOWCASE, INC.,** in favor of Holder and securing repayment of the Balloon Note.

   In consideration of the sum of **TEN ($10.00) DOLLARS** cash in hand paid and other valuable considerations, and to induce Holder to extend credit to Debtor, the undersigned, jointly and severally if more than one (herein called "undersigned"), which term shall include the singular and the plural, as the context requires or admits, does hereby irrevocably guarantee to Holder and to Holder's endorsers, transferees, successors or assigns of either this Guaranty or any of the obligations secured hereunder, or both, the prompt payment of all amounts due under the Balloon Note given by Debtor and payable to Holder, including any renewals, modifications, or extensions thereof; the prompt payment and performance of all sums and other obligations which may hereafter become due from Debtor to Holder under the terms of the Security Agreement, including any modifications or amendments thereof; and the prompt payment and performance of all sums and other obligations which may hereafter become due from Debtor to Holder under the terms of any agreement or other instrument or document made on the date hereof between Holder and Debtor with respect to the Balloon Note and Security Agreement or the debt evidenced by the Balloon Note, including any modifications or amendments thereof (herein collectively called the "Security Documents"). The undersigned does further agree that if the Balloon Note is not paid by Debtor in accordance with its terms, or if all sums and other obligations which may hereafter become due from Debtor to Holder under the Security Documents are not paid and performed by Debtor in accordance with the respective terms of each, the undersigned immediately will make the payments required and perform the obligations of the Debtor thereunder.

   The obligations covered by this Guaranty include all obligations of Debtor under the Balloon Note, and Security Documents, either now existing or hereafter coming into existence

Exhibit D

and all renewals, modifications, amendments or extensions thereof, in whole or in part, together with all damages, losses, costs, interest, charges, expenses, including reasonable attorneys' fees, and liabilities of every kind, nature and description, suffered or incurred by Holder arising from or in connection with the Balloon Note, or the Security Documents. The Guaranty shall cover all obligations to Holder made on behalf of Debtor by any officer or agent of Debtor, without regard to the actual authority of such officer or agent. This Guaranty shall not apply to any obligations of the undersigned to Holder under the Term Note, which is covered by a separate Guaranty.

The undersigned hereby consents and agrees that Holder may at any time, either with or without consideration, release any property or other security of any kind or nature whatsoever held by Holder or by any person, firm or corporation on Holder's behalf or for Holder's account, securing any indebtedness or liability covered by this Guaranty, or substitute for any collateral so held, other collateral of like kind or of any kind, or modify the terms of the Balloon Note, the Security Agreement or Security Documents, without notice to or further consent from the undersigned, and such surrender, substitution or modification shall not in any way affect the liability of the undersigned hereunder.

The undersigned hereby consents and agrees that Holder may at any time either with or without consideration, release Debtor or any endorser of the Balloon Note, or any Guarantor of the Balloon Note, and Security Agreement, or any of the Security Documents, without notice to or further consent from the undersigned, and such release shall not in any way affect the liability of the undersigned hereunder. The undersigned agrees that no act or omission on the part of Holder shall in any way affect or impair this Guaranty. The undersigned further waives notice of the acceptance of this Guaranty, or of any default by Debtor.

At the option of the Holder, this Agreement may be treated as a guaranty or as a suretyship. In any event, Holder, in its sole discretion, shall have the right to proceed against the Debtor or any property given as security for the payment of the Balloon Note, or any of the Security Documents, or any other Guarantor or endorser of the Balloon Note.

The undersigned acknowledges receipt of good, valuable and sufficient consideration for his, making of this Guaranty and subjects his separate property to this Guaranty and hereby expressly agrees that recourse may be had against such separate property for all his or its obligations hereunder, and the undersigned does further agree that any and all of such separate property shall be subject to execution for any judgment or decree on or enforcing this Guaranty by a court of competent jurisdiction against the undersigned. The undersigned further agrees that all liability of the undersigned shall be joint and several with any and all other, including future Guarantors of the Balloon Note and Security Agreement, if any.

The undersigned hereby waives and agrees not to assert or take advantage of (a) any right to require Holder to proceed against Debtor or to exhaust any security held by Holder or to pursue any other remedy in Holder's power before proceeding against the undersigned; (b) the defense of laches in any action hereunder or for the collection of any indebtedness or the performance of any obligation hereby guaranteed; (c) any defense arising by virtue of: (i) the lack of authority, death or disability of any party, or revocation hereof by any party or, (ii) the failure of the Holder to file or enforce a claim of any kind; (d) notice of the existence, creation or

incurring of any new or additional indebtedness, or obligation or of any action or non-action on the part of Debtor, Holder, any endorser, any Guarantor under this or any other instrument, any creditor of Debtor, or any other person whomsoever, in connection with any obligation or evidence of indebtedness or any obligation hereby guaranteed; (e) any defense (other than payment), including without limitation an election to proceed by nonjudicial rather than judicial foreclosure or any defense or any defense, which destroys or otherwise impairs the subrogation rights of the undersigned or the right of the undersigned to proceed against Debtor for reimbursement, or both; and (f) any duty on the part of Holder to disclose to the undersigned any facts which Holder may now or hereafter know about Debtor, regardless of whether Holder has reason to believe that any such facts materially increase the risk beyond that which the undersigned intends to assume or has reason to believe that such facts are unknown to the undersigned or has a reasonable opportunity to communicate such facts to the undersigned, it being understood and agreed that the undersigned is fully responsible for being and keeping informed of the financial condition of Debtor and of all circumstances bearing on the risk of nonpayment of all obligations hereby guaranteed.

The undersigned will not assert any right to which he may be or become entitled, whether by subrogation, contribution, or otherwise, against the Debtor or any of the other Guarantors, if any, or against any of their respective properties, by reason of the performance by the undersigned of its obligations under this Agreement, except after payment in full of all amounts (including costs and expenses) which may be or become payable in respect of or under the Balloon Note.

The undersigned hereby subordinates any and all indebtedness of Debtor now or hereafter owed to the undersigned, to all indebtedness of Debtor to Holder and agrees with Holder that the undersigned shall not demand or accept any payment of principal or interest from Debtor, shall not claim any off-set or other reduction of the undersigned's obligation hereunder because of such indebtedness, and shall not take any action to obtain any of the security described in the Security Agreement. Nothing herein shall prohibit any individual guarantor from receiving a salary and profit distributions from Debtor in the ordinary course of business.

If Debtor is a corporation, the undersigned agrees to retain the number of shares or amount of Debtor presently owned by him, and not to transfer, hypothecate, encumber, pledge or sell shares or membership interest to any other person or entity without the prior express written consent of Holder so long as the Balloon Note remains unpaid. Any loan to Debtor by the undersigned shall be subordinated and inferior to Debtor's obligations to Holder.

If the undersigned is a corporation, each such corporation hereby warrants and represents to Holder that it is a duly organized and validly existing corporation under the laws of the state of its incorporation; that it is qualified to do business in each state in which qualification is necessary; that it has the power to execute this Guaranty; that the execution of this Guaranty has been duly authorized; and that it is a binding and valid obligation of the corporation.

In the event Holder seeks to enforce this Guaranty by legal action, the liability of the undersigned hereunder shall terminate and cease only at the time Holder receives payment in full

of all sums payable to it by Debtor under the Balloon Note, whether such payment be made by the Debtor or the undersigned.

The undersigned agrees that this Guaranty shall inure to the benefit of and may be enforced by Holder or Holder's endorsees, transferees, successors and assigns, and shall be binding upon and enforceable against the undersigned and its legal representatives, heirs, successors and/or assigns.

In the event of default by Debtor under the terms and conditions of the Balloon Note and/or, it becomes necessary for Holder to employ counsel to enforce the obligations of the undersigned hereunder, whether or not suit be brought, the undersigned agrees to pay all reasonable counsel fees and expenses in connection therewith. This Guaranty shall be governed by and construed under the laws of the State of Florida, and the undersigned consents to the exclusive jurisdiction of the courts of such State and to being sued therein, and irrevocably waives any claim of lack of personal jurisdiction or *forum non conveniens* in connection with any litigation with Holder.

The Holder does not intend to violate any applicable usury laws. Accordingly, this Guaranty is expressly limited so that in no contingency or event whatsoever, shall the amount paid or agreed to be paid to the Holder hereunder (including all interest on the Balloon Note, any loan fees payable in connection herewith, and the aggregate of all other amounts taken, reserved or charged pursuant to the Balloon Note, or any other document securing the Balloon Note, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law. If, from any circumstances whatsoever, fulfillment of any obligation hereof or any other document securing the Balloon Note, at the time performance of such obligation shall be due, shall cause the effective rate of interest upon the sums evidenced by the Balloon Note to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid Principal Amount due under the Balloon Note and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Debtor.

This Guaranty Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one Agreement. In case any one or more of the Guarantors listed below shall fail or refuse to execute this instrument, the validity of this Guaranty as to those Guarantors executing this instrument shall be in no way affected, prejudiced or disturbed thereby.

**THE UNDERSIGNED AND HOLDER (BY ACCEPTANCE OF THIS GUARANTY) HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY**

COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER HOLDER OR DEBTOR. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE HOLDER EXTENDING CREDIT TO DEBTOR.

IN WITNESS WHEREOF, the undersigned has executed and delivered this instrument under seal as of the date first above written.

[SIGNATURES ON FOLLOWING PAGE]

Witnesses (as to all Guarantors):

Gabriel Paredes
Print Name:

MARIO R PEREZ
Print Name:

**EUSEBIO PAREDES,** individually

**FINANCING STATEMENT FORM**

**FILED**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
MARC I SOLOMON; 5618352111

Email MSOLOMON@WSH-LAW.COM

B. SEND ACKNOWLEDGEMENT TO:

2021 Jan 26 05:36 PM

****** 202105991597 ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BES INTERNATIONAL, INC | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 16115 NW 52ND AVE | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | MIAM GARDENS | FL | 33014 | US |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| RC HOME SHOWCASE INC | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 16115 NW 52ND AVE | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | MIAMI | FL | 33014 | US |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| MANUHEN ENTERPRISES, LLC | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 2103 CORAL WAY | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| SUITE 800 | MIAMI | FL | 33145 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

See attached Exhibit A.

**5. ALTERNATE DESIGNATION** (if applicable)  ☐LESSEE/LESSOR  ☐CONSIGNEE/CONSIGNOR  ☐BAILEE/BAILOR  ☐AG LIEN  ☐NON-UCC FILING  ☐SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**   #4269.001/BES

**STANDARD FORM - FORM UCC-1 (REV.05/2013)**    **Filing Office Copy**    **Approved by the Secretary of State, State of Florida**

Exhibit E

**Exhibit A**

**COLLATERAL**

(a)      All of RC Home Showcase, Inc.'s and BES International, Inc.'s accounts, accounts receivable, contract rights, and general intangibles, including, without limitation, all forms of payment, all present and future incomes, rents, revenues, issues and profits, goodwill, licenses and license rights, bailment or leasehold interests, whether as lessor or lessee, all choses in action and recoveries for any loss in value of the real estate of Debtor or items of property described in this Agreement, all rights of Debtor as an unpaid seller of goods and services (including, but not limited to, the rights of stoppage in transit, replevin, reclamation, and resale), rights in and to security agreements and other contracts or assignments providing security to Debtor, book debts, credits, indemnities, warranties or guarantees payable to Debtor on loss or damage of property, inventions, designs, design registrations, trademarks, trade styles, trade names, know-how, powers, privileges, logos, franchise rights, payments in kind, advertising and promotional materials, trade secrets, patents, patent rights, copyrights, patent applications, tax refunds, customer lists, business and accounting records, including all ledger account cards, computer tapes and disks and other computer information, in all cases whether now owned or hereafter created or acquired by Debtor or in which Debtor may now have or may after the date of this Agreement acquire an interest;

(b)      All inventory, including, without limitation, all goods held for sale or lease, finished goods, merchandise, parts, supplies, raw materials, and work-in-process of every kind and description, and all products thereof, whether now owned or acquired by Debtor after the date of this Agreement, or in which Debtor may now have or may after the date of this Agreement acquire an interest, including, without limitation, inventory temporarily out of Debtor's custody or possession and any returns or repossessions on any sales or accounts;

(c)      All goods, including, without limitation, equipment, machinery, materials, furniture, furnishings, engines, appliances, fixtures, tools, parts, supplies, and vehicles of every kind and description, whether now owned or acquired by Debtor after the date of this Agreement or delivered to the real property of Debtor, or in which Debtor may now have or may after the date of this Agreement acquire an interest, and all additions, accessions, replacements, substitutions, and improvements to such goods and wherever located;

(d)      All documents, documents of title, deposit accounts, negotiable and nonnegotiable instruments, shares, stocks, bonds, debentures, securities, moneys, sources of money, uncalled capital, letters of credit, investment property, and chattel paper whether now owned or acquired after the date of this Agreement by Debtor;

(e)      All instruments, documents, securities, monies, and property in which Debtor has or hereafter acquires rights which now or hereafter are at any time in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Secured Party had conditionally released the same; and

(f)      All proceeds and products of any of the personal property described above, in any form, including, without limitation, proceeds of any insurance relating to such collateral or fire and builder's risk insurance and unrenewed insurance premiums; proceeds consisting of any of the above types of collateral; all awards made in eminent domain proceedings or purchased in lieu of such eminent domain proceedings; proceeds of any noncommercial tort cause of action in existence, now or after the date of this Agreement; and all replacements, substitutions, renewals, returns, additions, accessions, rents, royalties, issues, documents of ownership, and receipts for any of the foregoing.

## PROMISSORY NOTE

$900,000.00

January 13, 2021

Miami, Florida

**FOR VALUE RECEIVED**, BES INTERNATIONAL. INC.. a Delaware corporation. and/or RC HOME SHOWCASE. INC., a Florida corporation. (collectively. the "Company" or "Debtor"), hereby promises to pay to the order of **MANUHEN ENTERPRISES, LLC**. and its successors and/or assigns (collectively. the "Holder"). at the Holder's address 2103 Coral Way. Suite 800. Miami, FL 33145 or such other place as the Holder may from time to time designate in writing. the principal sum of Nine Hundred Thousand Dollars (US$900,00.00) (the "Term Note"). in lawful money of the United States of America, and to pay interest on the unpaid principal balance thereof in like money at such address from the date hereof until the date when the principal balance shall have been paid in full at a rate of four percent (4%) per annum.   Accrued and unpaid interest on the unpaid principal balance hereof shall be payable monthly in arrears on the same day of each month. commencing March 14, 2021. Interest on this Term Note shall be computed on the actual number of days elapsed over a 365-day year (i.e., $1/365^{th}$ of a full year's interest shall accrue for each day any amount evidenced by this Term Note is outstanding).

The principal balance of $900,000.00, together with accrued but unpaid interest. shall be payable in consecutive sixty (60) equal monthly installments each in the amount of $16.574.87 commencing on March 14, 2021. and continuing thereafter on the same day of each succeeding month with a final payment of the unpaid outstanding principal. together with accrued but unpaid interest, due on March 14, 2026.

Payments of principal and interest hereunder shall be made at such place as the Holder may designate and shall be in immediately available funds in lawful money of the United States. This Term Note may be prepaid at any time in whole or in part without premium or penalty. All payments in respect of this Term Note shall be applied first to accrued interest and then to principal outstanding hereunder.

This Term Note is subject to the following terms and conditions:

1.      **Stock Purchase Agreement**. This Term Note is the "Term Note" issued pursuant to that certain Amended Stock Purchase Agreement. dated as of December 22. 2020 (the "Agreement"), by and between the Company and the Holder.  Capitalized terms used herein and not otherwise defined shall have those meanings given to them in the Agreement.

2.      **Security Agreement and Personal Guaranty**.  In consideration of and as an inducement to Holder to enter into the Agreement and accept from the Company/Debtor this Term Note, Holder and the Debtor have entered into a Security Agreement of even date hereof (the "Security Agreement") whereby Debtor has granted Holder a first and continuing security interest (the "Security Interest") in certain assets of RC Home Showcase. Inc., identified in the Security Agreement. together with (a) a Personal Guaranty executed by the Company's sole Shareholder, Eusebio Paredes, of even date hereof. further securing this Term Note. and (b) a life insurance policy naming Holder as the beneficiary. pursuant to the provisions of Section 1.2(d) of the Agreement.

3.      **Covenants**.  The Company covenants and agrees that the Company will punctually pay or cause to be paid the principal and interest on this Term Note at the dates and places and in the manner specified herein in lawful money of the United States of America in same day funds. without setoff, counterclaim or deduction of any kind.  The Company agrees. upon the request of Holder, to pay all taxes

-1-

Company ____
Holder ____



Exhibit F

including without limitation documentary stamps, interest and penalty, duties and other charges related to this Term Note and payment hereunder (other than taxes on or measured by net income of the Holder), in addition to the principal and interest evidenced by this Term Note.

4. **Maturity**. The principal amount of this Term Note, together with accrued but unpaid interest, shall be due and payable as follows:

The principal balance of $900,000.00, together with accrued but unpaid interest, shall be payable by the Company to Holder in consecutive sixty (60) equal monthly installments each in the amount of $16,574.87 commencing on March 14, 2021, and continuing thereafter on the same day of each succeeding month with a final payment of all unpaid outstanding principal and accrued but unpaid interest due in full on or before March 14, 2026.

5. **Default**.

a. **Default**. The occurrence of any one or more of the following events shall constitute an event of default (each an "Event of Default") hereunder:

(i) if the Company fails to make payment in full of any principal or interest payable with respect to this Term Note within five (5) business days on the date when due hereunder;

(ii) if the Company becomes insolvent (however defined or evidenced) or makes an assignment for the benefit of creditors;

(iii) if there shall be filed by or against the Company any petition for any relief under the bankruptcy laws of the United States now or hereafter in effect or any proceeding shall be commenced with respect to the Company under any insolvency, readjustment of debt, reorganization, dissolution, liquidation or similar law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity), provided that in the case of any involuntary filing or the commencement of any involuntary proceeding against the Company such proceeding or petition shall have continued undismissed and unvacated for at least 60 days;

(iv) if any petition or application to any court or tribunal, at law or in equity, shall be filed by or against the Company for the appointment of any receiver or trustee for the Company or any material part of the property of the Company, provided that in the case of any involuntary filing against the Company, such proceeding or appointment shall have continued undismissed and unvacated for at least 60 days;

(vi) the occurrence of a default or event of default under the Security Agreement securing this Term Note after the expiration of the applicable cure period; or

-2-

Company ____
Holder ____

(vii)    the dissolution of the Company (whether voluntarily or otherwise) or the merger, consolidation or reorganization of the Company without the prior written consent of the Holder, which consent may be arbitrarily withheld;

b.    **Notice of Event of Default.**    Upon the President, Vice President, Secretary or Treasurer (each a "Responsible Officer") of the Company acquiring knowledge of the existence of an Event of Default, the Company shall send to the Holder a written notice (the "Notice of Event of Default") specifying the nature and period of existence of any Event of Default and what action the Company is taking or proposes to take with respect thereto.

c.    **Remedies Upon Default.**    If any Event of Default shall occur for any reason, then and in any such event, in addition to all rights and remedies of the Holder under applicable law or otherwise, all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively and concurrently, the Holder may, at its option, declare any or all amounts owing under this Note, to be due and payable, whereupon the then unpaid balance hereof shall forthwith become due and payable, together with interest accruing thereafter at the lower of (i) eighteen percent (18.0%) per annum or (ii) the highest rate of interest allowed by Florida law. The indebtedness evidenced by this Note is secured by the Security Agreement, creating legal and valid encumbrances on and an assignment of all of the Company's interest in the Collateral, which Security Agreement is incorporated by reference herein. Holder shall have such rights with respect to the Collateral as is authorized by applicable law.

6.    **Right of Set-off.**    Company may be entitled to deduct and set-off from sums due to the Holder hereunder, as set forth in and pursuant to the terms of the Agreement, subject to the limitations set forth in the Agreement.

7.    **Other Matters.**

a.    **Prepayments.**    This Term Note may be prepaid in whole or in part at any time without premium or penalty of any kind. Time is of the essence to all terms and provisions set forth herein.

b.    **Severability.**    If any provision of this Term Note is invalid, illegal, or unenforceable, the balance of this Term Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances. The rate of interest on this Term Note is subject to any limitations imposed by applicable usury laws.

c.    **Headings**.    The headings in this Term Note are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Term Note.

d.    **Governing Law; Venue.**    This Term Note shall be governed by and construed in all respects under the laws of the State of Florida, without reference to its conflict of laws rules or principles. The Holder and the Company, and any endorsers, sureties, guarantors and all others who are, or who may become, liable for the payment of the sums due hereunder severally, irrevocably and unconditionally (a) agree that any suit, action, or other legal proceeding arising out of or relating to this Term Note may be brought, at the option of the Holder, in a court of record of the State of Florida in Miami-Dade County,

-3-

Company ____
Holder ____

e.    **Waiver.**  The rights and remedies of Holder as provided in this Term Note may be pursued against the Company, and any funds, property and security held by Holder for the payment hereof or otherwise at the sole discretion of Holder.  The failure to exercise any right or remedy shall in no event be construed as a waiver or release of said right or remedy or of the right to exercise them at any later time.   None of the terms or provisions of this Term Note may be waived, altered, modified or amended except as the Holder may consent thereto in writing, and then only to the extent and for the period of time expressly stated therein.

f.    **Presentment.**    The Company waives diligence, presentment, protest and demand, and also notice of protest, of demand, of nonpayment, of dishonor and of maturity and also recourse to suretyship defenses generally.  Further, the Company hereby consents to any and all renewals, extensions or modifications of the terms hereof, including time for payment, and further agree that any such renewal, extension or modification of the terms hereof or the release or substitution of any security for the indebtedness evidenced hereby or any other indulgences shall not affect the liability of the Company for the indebtedness evidenced by this Term Note.

g.    **Attorneys' Fees.**  The Company agrees to pay reasonable attorneys' fees and costs of collection if an attorney is retained by the Holder of this Term Note to secure collection hereof, whether or not litigation is required, and if litigation is required, such reasonable attorneys' fees and costs at all trial and appellate levels and/or in all post-judgment proceedings. All such amounts shall become immediately due and payable, shall bear interest at the rate provided for hereunder from the date incurred until paid and shall become additional indebtedness evidenced by this Term Note.

h.    **Successors and Assigns.**  Whenever used herein, the words "Company" and "Holder" shall be deemed to include their respective heirs, legal representatives, successors, assigns and successors in interest.  The Company may not assign or delegate any rights or obligations hereunder without the prior written consent of Holder.

i.    **Usury.**  It is the intention of the parties hereto to comply with all applicable usury laws; accordingly, it is agreed that notwithstanding any provisions to the contrary in this Term Note or the Security Agreement securing this Term Note, in no event shall this Term Note require the payment or permit the collection of interest in excess of the maximum amount permitted by such laws. If any such excess of interest is contracted for, charged or received under this Term Note, or in the event the maturity of the indebtedness evidenced hereby is accelerated in whole or in part, or in the event that all or part of the principal or interest of this Term Note shall be prepaid, so that under any of such circumstances the amount of interest contracted for, charged or received under this Term Note shall exceed the maximum amount of interest permitted by the applicable usury laws, then in any such event, (a) the provisions of this paragraph shall govern or control, (b) neither the Company nor any other person or entity now or hereafter liable for the payment of this Term Note shall be obligated to pay the amount of such interest to the extent that is in excess of the maximum amount of interest permitted by the applicable usury laws, (c) any such excess which may have been collected shall be either applied as a credit against the then unpaid principal amount hereof or refunded to the Company, at the Holder's option, and (d) the effective rate of interest for this Note shall be automatically reduced to the maximum lawful rate allowed for this Term Note under the applicable usury jurisdiction thereof.

THE COMPANY, BY EXECUTION HEREOF, AND THE HOLDER, BY ACCEPTANCE HEREOF, MUTUALLY AND WILLINGLY WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY AND ALL CLAIMS MADE BETWEEN THEM WHETHER NOW EXISTING OR ARISING IN THE

-4-

Company ____
Holder ____




FUTURE, INCLUDING WITHOUT LIMITATION, ANY AND ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSS CLAIMS, THIRD PARTY CLAIMS AND INTERVENOR'S CLAIMS WHETHER ARISING FROM OR RELATED TO THE NEGOTIATION, EXECUTION AND PERFORMANCE OF THE TRANSACTIONS TO WHICH THIS TERM NOTE RELATES.

**IN WITNESS WHEREOF,** the Company has caused this Note to be executed on its behalf by the undersigned thereunto duly authorized.

BES INTERNATIONAL, INC.

By: _____

President

RC HOME SHOWCASE, INC.

By: _____

President

-5-

Company ____
Holder ____

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is made and entered into as of this 13th day of January 2021, by and among, **MANUHEN ENTERPRISES, LLC** (referred to herein as the "Secured Party"), and **BES INTERNATIONAL INC.,** a Delaware corporation and **RC Home Showcase, Inc.,** a Florida corporation, (collectively the "Debtor").

## WITNESSETH

In consideration of the mutual covenants contained herein and other good and valuable consideration, the parties hereto agree as follows:

1.      The Collateral.  In consideration of and as an inducement to Secured Party to enter into that certain Amended stock Purchase Agreement dated as of December 22, 2020 ("Stock Purchase Agreement") and accept from the Debtor that certain Term Promissory Note of even date hereof in the original principal amount of $900,000.00 (the "Term Note"), the Debtor hereby grants the Secured Party a first and continuing security interest (the "Security Interest") in the acquired Shares and Assets identified in Exhibit A hereto, together with all proceeds of the foregoing, including, without limitation, all general intangibles relating to or arising from the Assets, all cash and non-cash proceeds, income, profits, and benefits resulting from any of the foregoing, and, to the extent not otherwise included, all payments under insurance (whether or not the Secured Party is the loss payee thereof), or any indemnity, warranty, or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing, and together with all products, replacements, additions, betterments, extensions, renewals and accessions of any of the foregoing (the "Collateral").

2.      The Obligations.  This Agreement is being executed and delivered in connection with the Debtor's obligations pursuant to the Stock Purchase Agreement and Debtor's contemporaneous execution and delivery of that certain Term Note.  The Security Interest herein granted shall secure full and prompt payment and performance of all of the Debtor's obligations to Secured Party under the Term Note, whether direct or indirect, contingent or absolute, now or hereafter due or owing to Secured Party from Debtor by reason of the Term Note, and any and all renewals thereof (collectively, the "Obligations").

3.      Representations and Warranties of the Debtor.  The Debtor represents and warrants, and so long as the Obligations remain unpaid, the Debtor shall be deemed continuously to represent and warrant, that:

(a)     No Prior Interests on Collateral.  The Debtor is the owner of the Collateral free from any lien, encumbrance or other right, title or interest of any person or entity, except for the security interest in favor of the Secured Party created hereby, and Debtor will defend the Collateral against the claims and demands of all persons at any time claiming the same or any interest therein and affirms that no financing statements covering the Collateral and its proceeds are on file in any public office, except for the security interests in favor of Secured Party, and those liens on file as of the Closing Date, in any public office there is and shall be no adverse lien, security interest or encumbrance on or in the Collateral. Upon execution of this Agreement, the Debtor shall deliver such documents and endorsements in favor of the Secured Party as are required to show that the Collateral has been collaterally assigned to the Secured Party under this Agreement. The Debtor will not, without the prior written consent of the Secured Party, sell, pledge, assign or otherwise dispose of any of the Collateral, except in the ordinary course of business, or permit any setoff, lien or security interest to exist thereon except to the Secured Party, or as set forth in the Stock Purchase Agreement.



Exhibit G

(b)    Company Existence.  The Debtor (a) is a corporation duly organized, validly existing and in good standing under the laws of Florida and/or Delaware; (b) has all requisite company power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted; and (c) has qualified to do business in all jurisdictions in which the nature of the Debtor's business requires that the Debtor be qualified.

(c)    Absence of Conflicts.  The execution, delivery and performance by the Debtor of this Agreement will not (a) violate any provision of any existing law or regulation, or any judgment, order or award of any court, arbitrator or governmental authority; (b) violate any provision of the Debtor's articles of incorporation; (c) violate, be in conflict with, result in a breach of or constitute a default under any agreement or instrument to which the Debtor is a party or by which the Debtor or any of its properties may be bound; or (d) result in the creation or imposition of any security interest, lien, charge or encumbrance of any nature whatsoever upon the property or assets of the Debtor (except as created hereby).

(d)    Company Power; Authorization; Enforceable Obligations.  The Debtor has all necessary company power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by the Debtor of this Agreement has been duly authorized by all necessary company action on the part of the Debtor; and, this Agreement has been duly and validly executed and delivered by the Debtor and constitutes the legal, valid and binding obligation of the Debtor, enforceable in accordance with its terms, except to the extent that enforceability hereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by principles of equity regarding the availability of remedies.

4.    Covenants of the Debtor.  So long as the Obligations remain unpaid the Debtor will perform and observe each of its covenants to the Secured Party as set forth herein, and (a) will defend the Collateral against the claims and demands of all other parties; (b) will keep the Collateral free from all security interests or other encumbrances except the Security Interest; (c) will, upon demand, deliver to the Secured Party any documents relating to the Collateral or any part thereof, and any and all other schedules, documents and statements which the Secured Party may from time to time reasonably request; (d) will notify the Secured Party promptly in writing of any change in the Debtor's address specified above; (e) without the Secured Party's written consent will not make or agree to make any alteration or modification to the Collateral or permit anything to be done that may impair the value of the Collateral or the security intended to be afforded by this Agreement; (f) will keep and maintain the Collateral in good order and repair at all times; (g) until this Agreement is terminated, the Collateral shall be insured by Debtor at its expense against all risk to which it is exposed, including fire, theft and windstorm; (h) will promptly pay all taxes as they become due on the Collateral; and (i) shall not (i) permit any liens or security interests (other than those permitted by this Agreement) to attach to any of the Collateral, (ii) permit any of the Collateral to be levied upon under legal process or be subject to any unpaid charge, including taxes, (iii) sell, transfer, lease or otherwise dispose of any of the Collateral or any interest therein, or offer to do so, except in the ordinary course of business, without the prior written consent of Secured Party, or (iv) permit anything to be done that may impair the value of any of the Collateral or the security intended to be afforded by this Agreement.

5.    Events of Default.  Debtor shall be in default (each, an "Event of Default") under this Agreement upon the happening of any one or more of the following events, circumstances or conditions, to wit: (i) an Event of Default shall occur as specified in the Term Note; (ii) failure by Debtor to comply with or perform any provision of this Agreement on its part to be complied with or performed for a period of seven (7) days after Debtor's receipt of written notice of default by Secured Party; (iii) any material representations or warranties made or given, or to be made or given, by Debtor in this Agreement or in the Term Note, shall have been incorrect, false or misleading in any material respect when made; or (iv) subjection of the Collateral, or any part thereof, to attachment, charging order, garnishment, levy of execution or other judicial process, or if any involuntary lien or encumbrance shall be filed against any

portion of the Collateral. If any Event of Default shall occur and be continuing the Secured Party may, at its option, by notice in writing to the Debtor, declare all of the Obligations to be immediately due and payable, together with interest accrued thereon in accordance with the Term Note.

6. <u>Remedies</u>. Upon the happening of any Event of Default:

(a) · The Secured Party's rights with respect to the Collateral shall be those of a secured party under the Florida Uniform Commercial Code as now in effect or hereinafter amended. The Secured Party shall also have any additional rights granted herein. If requested by the Secured Party the Debtor will immediately make the Collateral available to the Secured Party at a place to be designated by the Secured Party. Secured Party, at its option, may enter upon Debtor's premises peaceably by Secured Party's own means or with legal process and take possession of the Collateral (and any books, records, files, papers, information and other data pertaining thereto), or render it immobile, or dispose of the Collateral on Debtor's premises and Debtor agrees not to resist or interfere.

(b) The Secured Party shall have the right, at its option, to demand, collect and sue for all proceeds from the Collateral (either in the Debtor's name or the Secured Party's name at the latter's option) with the right to enforce, compromise, settle or discharge any such proceeds. The Debtor appoints the Secured Party the Debtor's attorney-in-fact to endorse the Debtor's name on all checks, commercial paper and other instruments pertaining to the proceeds, after any Event of Default.

(c) The Debtor agrees that any notice by the Secured Party of the sale or disposition of the Collateral or any other intended action hereunder, whether required by the Florida Uniform Commercial Code or otherwise, shall constitute reasonable notice to the Debtor if the notice is mailed by regular or certified mail, postage prepaid, at least five (5) days before the action to the Debtor's address as specified in this Agreement or to any other address which the Debtor has specified in writing to the Secured Party as the address to which notices shall be given to the Debtor. The Debtor further agrees that the Secured Party may be the purchaser of the Collateral at any public or private sale.

(d) The Debtor shall pay all costs and expenses incurred by the Secured Party in enforcing this Agreement, realizing upon any Collateral and collecting any Obligations, including reasonable attorney's fees whether suit is brought or not and whether incurred in connection with collection, trial, appeal or otherwise.

(e) All of the rights, powers, remedies and privileges of Secured Party in the Event of Default, as provided under this Agreement and under applicable law, including, but not limited to, the Uniform Commercial Code, shall be cumulative and in addition one to the other, and in addition to those rights, powers, remedies and privileges afforded Secured Party under the provisions of this Agreement or the Term Note, and such rights, powers, remedies and privileges may be exercised singly or concurrently on one or more occasions.

(f) If, at any time, in the opinion of Secured Party, a receivership may be necessary to protect the Collateral, whether before or after maturity of the indebtedness hereby secured, or at any time, or after the institution of suit to collect such indebtedness or enforce this Agreement, the Secured Party shall have the right to appointment, on ex parte application, and without notice to anyone, by any court having jurisdiction, of a receiver to take charge of the Collateral.

7. <u>Miscellaneous</u>.

(a) The Debtor authorizes the Secured Party at the Debtor's expense to file any financing statement or other documents or statements relating to the Collateral (without the Debtor's

- 3 -



signature thereon) which the Secured Party deems appropriate, and the Debtor appoints the Secured Party as the Debtor's attorney-in-fact to execute any such financing statement or statements in the Debtor's name and to perform all other acts which the Secured Party deems appropriate to perfect and to continue perfection of the Security Interest.

(b)     After any Event of Default, the Secured Party may notify any party obligated to pay proceeds, of the existence of the Secured Interest and may also direct them to make payments of all proceeds to the Secured Party.

(c)     No delay or omission by the Secured Party in exercising any right hereunder or with respect to any Obligations shall operate as a waiver of that or any other right, and no single or partial exercise of any right shall preclude the Secured Party from any other or future exercise of the right or the exercise of any other right or remedy. The Secured Party may cure any Event of Default by the Debtor in any reasonable manner without waiving the Event of Default so cured and without waiving any other prior or subsequent default by the Debtor. All rights and remedies of the Secured Party under this Agreement and under the Florida Uniform Commercial Code shall be deemed cumulative.

(d)     The Secured Party shall have no obligation to take and the Debtor shall have the sole responsibility for taking any steps to preserve rights against all prior parties to the Collateral.

(e)     The rights and benefits of the Secured Party under this Agreement shall, if the Secured Party agrees, inure to any party acquiring an interest in the Obligations or any part thereof.

(f)     At its option, the Secured Party may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral. The Debtor shall reimburse the Secured Party on demand for any such payments made or expenses incurred by the Secured Party.

(g)     The terms "the Secured Party" and "the Debtor" as used in this Agreement include the heirs, personal representatives, and successors or assigns of those parties, as applicable.

(h)     This Agreement may not be modified or amended nor shall any provision of it be waived except in a writing signed by the Debtor and by an authorized officer of the Secured Party.

(i)     This Agreement shall be construed under the Florida Uniform Commercial Code and any other applicable Florida laws in effect from time to time.

(j)     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the remaining provisions.

(k)     All sections and descriptive headings in this Agreement are inserted for convenience only, and shall not affect the construction or interpretation hereof.

(l)     This Agreement is a continuing agreement which shall remain in force and effect until all of the Obligations and any extensions or renewals, together with all interest thereon, shall be paid in full.

(m)     **JURY WAIVER. THE SECURED PARTY AND THE DEBTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREIN, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR**

- 4 -

**ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.**

        (n)     With respect to any legal action or proceeding arising under this Agreement or concerning the Collateral, the Debtor, to the fullest extent permitted by law, hereby: (a) submits to the jurisdiction of the state and federal courts in the State of Florida; (b) agrees that the venue of any such action or proceeding may be laid in Miami-Dade County, Florida (in addition to any county in which any of the Collateral is located) and waives any claim that the same is an inconvenient forum; (c) stipulates that service of process in any such action or proceeding shall be properly made if mailed by any form of registered or certified mail (airmail if international), postage prepaid, to the address then registered in Secured Party's records for the Debtor, and that any process so served shall be effective ten days after mailing; (d) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts; (e) waives trial by jury; and (f) waives any right to interpose any set-off or non-compulsory counterclaim or to plead laches or any statute of limitations as a defense in any such action or proceeding, and waives all provisions and requirements of law for the benefit of Debtor now or hereafter in force. No provision of this Agreement shall limit Secured Party's right to serve legal process in any other manner permitted by law or to bring any such action or proceeding in any other competent jurisdiction.

        (o)     Time is of the essence with respect to the provisions of this Agreement.

        (p)     Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

*[Remainder of page intentionally left blank.]*



**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Security Agreement as of the date first written above.

**DEBTOR:**

**BES INTERNATIONAL, INC.**

By: _____
Eusebio Paredes, President

RC HOME SHOWCASE, INC.

BY: *Eusebio Paredes*
_____
Name: _____ Title *President*

**SECURED PARTY:**

**MANUHEN ENTERPRISES, LLC**

By: _____
Manuel A. Kronfle, Manager

Witnesses

MARIO R PEREZ

STATE OF FLORIDA       )
                       ) SS:
COUNTY OF MIAMI-DADE   )

The foregoing instrument was acknowledged before me this 14 day of January 2021, by _Eusebio Paredes_, as the President of BES INTERNATIONAL, Corp., a Delaware corporation on behalf of such entity and RC HOME SHOWCASE, INC. He/ is personally known to me or produced _FDL_ as identification.

_____
Print Name: _____
NOTARY PUBLIC

My Commission Expires:

MARIA M. GARCIA
Commission # GG 168915
Expires April 16, 2022
Bonded Thru Budget Notary Services

- 6 -

STATE OF FLORIDA          )
                          ) SS:
COUNTY OF MIAMI-DADE      )

The foregoing instrument was acknowledged before me this ___ day of January 2021, by Manuel A. Kronfle, as Manager of Manuhen Enterprises, LLC. He is personally known to me or produced _____ as identification.

Print Name: _____
NOTARY PUBLIC

- 7 -

## Exhibit A

## COLLATERAL

(a)      All of RC Home Showcase, Inc.'s accounts, accounts receivable, contract rights, and general intangibles, including, without limitation, all forms of payment, all present and future incomes, rents, revenues, issues and profits, goodwill, licenses and license rights, bailment or leasehold interests, whether as lessor or lessee, all choses in action and recoveries for any loss in value of the real estate of Debtor or items of property described in this Agreement, all rights of Debtor as an unpaid seller of goods and services (including, but not limited to, the rights of stoppage in transit, replevin, reclamation, and resale), rights in and to security agreements and other contracts or assignments providing security to Debtor, book debts, credits, indemnities, warranties or guarantees payable to Debtor on loss or damage of property, inventions, designs, design registrations, trademarks, trade styles, trade names, know-how, powers, privileges, logos, franchise rights, payments in kind, advertising and promotional materials, trade secrets, patents, patent rights, copyrights, patent applications, tax refunds, customer lists, business and accounting records, including all ledger account cards, computer tapes and disks and other computer information, in all cases whether now owned or hereafter created or acquired by Debtor or in which Debtor may now have or may after the date of this Agreement acquire an interest;

(b)      All inventory, including, without limitation, all goods held for sale or lease, finished goods, merchandise, parts, supplies, raw materials, and work-in-process of every kind and description, and all products thereof, whether now owned or acquired by Debtor after the date of this Agreement, or in which Debtor may now have or may after the date of this Agreement acquire an interest, including, without limitation, inventory temporarily out of Debtor's custody or possession and any returns or repossessions on any sales or accounts;

(c)      All goods, including, without limitation, equipment, machinery, materials, furniture, furnishings, engines, appliances, fixtures, tools, parts, supplies, and vehicles of every kind and description, whether now owned or acquired by Debtor after the date of this Agreement or delivered to the real property of Debtor, or in which Debtor may now have or may after the date of this Agreement acquire an interest, and all additions, accessions, replacements, substitutions, and improvements to such goods and wherever located;

(d)      All documents, documents of title, deposit accounts, negotiable and nonnegotiable instruments, shares, stocks, bonds, debentures, securities, moneys, sources of money, uncalled capital, letters of credit, investment property, and chattel paper whether now owned or acquired after the date of this Agreement by Debtor;

(e)      All instruments, documents, securities, monies, and property in which Debtor has or hereafter acquires rights which now or hereafter are at any time in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Secured Party had conditionally released the same; and

(f)      All proceeds and products of any of the personal property described above, in any form, including, without limitation, proceeds of any insurance relating to such collateral or fire and

- 8 -

builder's risk insurance and unrenewed insurance premiums: proceeds consisting of any of the above types of collateral: all awards made in eminent domain proceedings or purchased in lieu of such eminent domain proceedings: proceeds of any noncommercial tort cause of action in existence, now or after the date of this Agreement: and all replacements, substitutions, renewals, returns, additions, accessions, rents, royalties, issues, documents of ownership, and receipts for any of the foregoing.

## UNCONDITIONAL AND IRREVOCABLE
## GUARANTY OF PAYMENT

DATE:        January 13, 2021

DEBTOR:      **BES INTERNATIONAL INC.,** a Delaware corporation **and** RC Home Showcase, Inc., a Florida corporation

HOLDER:       **MANUHEN ENTERPRISES, LLC**

NOTE:        That certain Promissory Note ("Term Note") of even date herewith executed by Debtor in favor of Holder in the principal amount of **NINE HUNDRED THOUSAND DOLLARS ($900,000.00).**

SECURITY
AGREEMENT:   That certain Security Agreement ("Security Agreement") of even date herewith executed by **BES INTERNATIONAL, INC.,** a Delaware corporation, and **RC HOME SHOWCASE, INC.,** a Florida corporation, in favor of Holder and securing repayment of the Term Note.

In consideration of the sum of **TEN ($10.00) DOLLARS** cash in hand paid and other valuable considerations, and to induce Holder to extend credit to Debtor, the undersigned, and any successors and assigns, jointly and severally if more than one (herein called "undersigned"), which term shall include the singular and the plural, as the context requires or admits, does hereby irrevocably guarantee to Holder and to Holder's endorsers, transferees, successors or assigns of either this Guaranty or any of the obligations secured hereunder, or both, the prompt payment of all amounts due under the Term Note given by Debtor and payable to Holder, including any renewals, modifications, or extensions thereof; the prompt payment and performance of all sums and other obligations which may hereafter become due from Debtor to Holder under the terms of the Security Agreement, including any modifications or amendments thereof; and the prompt payment and performance of all sums and other obligations which may hereafter become due from Debtor to Holder under the terms of any agreement or other instrument or document made on the date hereof between Holder and Debtor with respect to the Term Note and Security Agreement or the debt evidenced by the Term Note, including any modifications or amendments thereof (herein collectively called the "Security Documents"). The undersigned does further agree that if the Term Note is not paid by Debtor in accordance with its terms, or if all sums and other obligations which may hereafter become due from Debtor to Holder under the Security Documents are not paid and performed by Debtor in accordance with the respective terms of each, the undersigned immediately will make the payments required and perform the obligations of the Debtor thereunder.

The obligations covered by this Guaranty include all obligations of Debtor under the Term Note, and Security Documents, either now existing or hereafter coming into existence and all renewals, modifications, amendments or extensions thereof, in whole or in part, together with



Exhibit H

all damages, losses, costs, interest, charges, expenses, including reasonable attorneys' fees, and liabilities of every kind, nature and description, suffered or incurred by Holder arising from, or in connection with the Term Note, or the Security Documents. The Guaranty shall cover all obligations to Holder made on behalf of Debtor by any officer or agent of Debtor, without regard to the actual authority of such officer or agent. This Guaranty shall not apply to any obligations of the undersigned to Holder under the Balloon Note, which is covered by a separate Guaranty.

The undersigned hereby consents and agrees that Holder may at any time, either with or without consideration, release any property or other security of any kind or nature whatsoever held by Holder or by any person, firm or corporation on Holder's behalf or for Holder's account, securing any indebtedness or liability covered by this Guaranty, or substitute for any collateral so held, other collateral of like kind or of any kind, or modify the terms of the Term Note, the Security Agreement or Security Documents, without notice to or further consent from the undersigned, and such surrender, substitution or modification shall not in any way affect the liability of the undersigned hereunder.

The undersigned hereby consents and agrees that Holder may at any time either with or without consideration, release Debtor or any endorser of the Term Note, or any Guarantor of the Term Note, and Security Agreement, or any of the Security Documents, without notice to or further consent from the undersigned, and such release shall not in any way affect the liability of the undersigned hereunder. The undersigned agrees that no act or omission on the part of Holder shall in any way affect or impair this Guaranty. The undersigned further waives notice of the acceptance of this Guaranty, or of any default by Debtor.

At the option of the Holder, this Agreement may be treated as a guaranty or as a suretyship. In any event, Holder, in its sole discretion, shall have the right to proceed against the Debtor or any property given as security for the payment of the Term Note, or any of the Security Documents, or any other Guarantor or endorser of the Term Note.

The undersigned acknowledges receipt of good, valuable and sufficient consideration for his, making of this Guaranty and subjects his separate property to this Guaranty and hereby expressly agrees that recourse may be had against such separate property for all his or its obligations hereunder, and the undersigned does further agree that any and all of such separate property shall be subject to execution for any judgment or decree on or enforcing this Guaranty by a court of competent jurisdiction against the undersigned. The undersigned further agrees that all liability of the undersigned shall be joint and several with any and all other, including future Guarantors of the Term Note and Security Agreement, if any.

The undersigned hereby waives and agrees not to assert or take advantage of (a) any right to require Holder to proceed against Debtor or to exhaust any security held by Holder or to pursue any other remedy in Holder's power before proceeding against the undersigned; (b) the defense of laches in any action hereunder or for the collection of any indebtedness or the performance of any obligation hereby guaranteed; (c) any defense arising by virtue of: (i) the lack of authority, death or disability of any party, or revocation hereof by any party or, (ii) the failure of the Holder to file or enforce a claim of any kind; (d) notice of the existence, creation or incurring of any new or additional indebtedness, or obligation or of any action or non-action on

the part of Debtor, Holder, any endorser, any Guarantor under this or any other instrument, any creditor of Debtor, or any other person whomsoever, in connection with any obligation or evidence of indebtedness or any obligation hereby guaranteed; (e) any defense (other than payment), including without limitation an election to proceed by nonjudicial rather than judicial foreclosure or any defense or any defense, which destroys or otherwise impairs the subrogation rights of the undersigned or the right of the undersigned to proceed against Debtor for reimbursement, or both; and (f) any duty on the part of Holder to disclose to the undersigned any facts which Holder may now or hereafter know about Debtor , regardless of whether Holder has reason to believe that any such facts materially increase the risk beyond that which the undersigned intends to assume or has reason to believe that such facts are unknown to the undersigned or has a reasonable opportunity to communicate such facts to the undersigned, it being understood and agreed that the undersigned is fully responsible for being and keeping informed of the financial condition of Debtor and of all circumstances bearing on the risk of nonpayment of all obligations hereby guaranteed.

The undersigned will not assert any right to which he may be or become entitled, whether by subrogation, contribution, or otherwise, against the Debtor or any of the other Guarantors, if any, or against any of their respective properties, by reason of the performance by the undersigned of its obligations under this Agreement, except after payment in full of all amounts (including costs and expenses) which may be or become payable in respect of or under the Term Note.

The undersigned hereby subordinates any and all indebtedness of Debtor now or hereafter owed to the undersigned, to all indebtedness of Debtor to Holder and agrees with Holder that the undersigned shall not demand or accept any payment of principal or interest from Debtor shall not claim any off-set or other reduction of the undersigned's obligation hereunder because of such indebtedness and shall not take any action to obtain any of the security described in the Security Agreement. Nothing herein shall prohibit any individual guarantor from receiving a salary and profit distributions from Debtor in the ordinary course of business.

If Debtor is a corporation, the undersigned agrees to retain the number of shares or amount of Debtor presently owned by him, and not to transfer, hypothecate, encumber, pledge or sell shares or membership interest to any other person or entity without the prior express written consent of Holder so long as the Term Note remains unpaid. Any loan to Debtor by the undersigned shall be subordinated and inferior to Debtor's obligations to Holder.

If any of the undersigned is a corporation, each such corporation hereby warrants and represents to Holder that it is a duly organized and validly existing corporation under the laws of the state of its incorporation; that it is qualified to do business in each state in which qualification is necessary; that it has the power to execute this Guaranty; that the execution of this Guaranty has been duly authorized; and that it is a binding and valid obligation of the corporation.

In the event Holder seeks to enforce this Guaranty by legal action, the liability of the undersigned hereunder shall terminate and cease only at the time Holder receives payment in full of all sums payable to it by Debtor under the Balloon Note, whether such payment be made by the Debtor or the undersigned.

The undersigned agrees that this Guaranty shall inure to the benefit of and may be enforced by Holder or Holder's endorsees, transferees, successors and assigns, and shall be binding upon and enforceable against the undersigned and its legal representatives, heirs, successors and/or assigns.

In the event of default by Debtor under the terms and conditions of the Balloon Note and/or, it becomes necessary for Holder to employ counsel to enforce the obligations of the undersigned hereunder, whether or not suit be brought, the undersigned agrees to pay all reasonable counsel fees and expenses in connection therewith. This Guaranty shall be governed by and construed under the laws of the State of Florida, and the undersigned consents to the exclusive jurisdiction of the courts of such State and to being sued therein, and irrevocably waives any claim of lack of personal jurisdiction or *forum non conveniens* in connection with any litigation with Holder.

The Holder does not intend to violate any applicable usury laws. Accordingly, this Guaranty is expressly limited so that in no contingency or event whatsoever, shall the amount paid or agreed to be paid to the Holder hereunder (including all interest on the Term Note, any loan fees payable in connection herewith, and the aggregate of all other amounts taken, reserved or charged pursuant to the Term Note, or any other document securing the Term Note, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law. If, from any circumstances whatsoever, fulfillment of any obligation hereof or any other document securing the Term Note, at the time performance of such obligation shall be due, shall cause the effective rate of interest upon the sums evidenced by the Term Note to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid Principal Amount due under the Term Note and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Debtor.

This Guaranty Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one Agreement. In case any one or more of the Guarantors listed below shall fail or refuse to execute this instrument, the validity of this Guaranty as to those Guarantors executing this instrument shall be in no way affected, prejudiced or disturbed thereby.

THE UNDERSIGNED AND HOLDER (BY ACCEPTANCE OF THIS GUARANTY) HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER HOLDER OR DEBTOR. THIS

PROVISION IS A MATERIAL INDUCEMENT FOR THE HOLDER EXTENDING CREDIT TO DEBTOR.

IN WITNESS WHEREOF. the undersigned has executed and delivered this instrument under seal as of the date first above written.

[SIGNATURES ON FOLLOWING PAGE]

Witnesses (as to all Guarantors):

Print Name: MARIO R PEREZ

Print Name:

EUSEBIO PAREDES, individually

**FINANCING STATEMENT FORM**

**FILED**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

PETER ARIZ, ESQ; 3058599898

Email  PARIZ@ARIZLAWPA.COM

B. SEND ACKNOWLEDGMENT TO:

Name  PETER ARIZ, ESQ

Address  2103 CORAL WAY STE 800

Address

City/State/Zip MIAMI, FL 33145

2021 Feb 12 12:09 PM

****** 202106155938 ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BES INTERNATIONAL INC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS Line One | | | | |
| 16115 NW 52 AVE | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY MIAMI GARDENS | STATE FL | POSTAL CODE 33014 | COUNTRY US |

---

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| RC HOME SHOWCASE INC | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS Line One | | | | |
| 16115 NW 52 AVE | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY MIAMI | STATE FL | POSTAL CODE 33014 | COUNTRY US |

---

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MANUHEN ENTERPRISES LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS Line One | | | | |
| 2103 CORAL WAY, SUITE 800 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY MIAMI | STATE FL | POSTAL CODE 33145 | COUNTRY US |

---

**4. This FINANCING STATEMENT covers the following collateral:**

All Assets of every nature whatsoever now or hereafter owned by debtor as more particularly described in Exhibit "A" attached hereto.

---

**5. ALTERNATE DESIGNATION** (if applicable)   ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR
   ☐ AG LIEN   ☐ NON-UCC FILING   ☐ SELLER/BUYER

---

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

---

**7. OPTIONAL FILER REFERENCE DATA**

---

**STANDARD FORM - FORM UCC-1 (REV.05/2013)**      **Filing Office Copy**      **Approved by the Secretary of State, State of Florida**

Exhibit I

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE
# FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
PEDRO ARIZ, ESQ, (305) 859-9898

**B. Email Address**

**C. SEND ACKNOWLEDGEMENT TO:**

Name    PEDRO A ARIZ, ESQ

Address    2103 CORAL WAY

Address    SUITE 800

City/State/Zip    MIAMI, FL 33145

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BES INTERNATIONAL, INC. | | | |

| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 1.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| 16115 NW 52nd Ave | | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
|  | MIAMI GARDENS | | FL | 33014 |  |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| RC HOME SHOWCASE, INC | | | |

| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 2.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| 16115 N.W. 52ND AVE | | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
|  | MIAMI | | FL | 33014 |  |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY **ONE** SECURED PARTY (3a OR 3b)

| 3.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| MANUHEN ENTERPRISES, LLC | | | |

| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 3.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| 2103 CORAL WAY, SUITE 800 | | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
|  | MIAMI | | FL | 33145 |  |

**4. This FINANCING STATEMENT covers the following collateral:**

All assets of every nature whatsoever now or hereafter owned by Debtor as more particularly described In Exhibit "A" attached hereto

**5. ALTERNATE DESIGNATION** (if applicable)    ☐ LESSEE/LESSOR    ☐ CONSIGNEE/CONSIGNOR    ☐ BAILEE/BAILOR
☐ AG LIEN    ☐ NON-UCC FILING    ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE BOX**

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-1 (REV.05/2013)        Filing Office Copy        Approved by the Secretary of State, State of Florida

## Exhibit A

## COLLATERAL

(a)       All of RC Home Showcase, Inc.'s and BES International, Inc.'s accounts, accounts receivable, contract rights, and general intangibles, including, without limitation, all forms of payment, all present and future incomes, rents, revenues, issues and profits, goodwill, licenses and license rights, bailment or leasehold interests, whether as lessor or lessee, all choses in action and recoveries for any loss in value of the real estate of Debtor or items of property described in this Agreement, all rights of Debtor as an unpaid seller of goods and services (including, but not limited to, the rights of stoppage in transit, replevin, reclamation, and resale), rights in and to security agreements and other contracts or assignments providing security to Debtor, book debts, credits, indemnities, warranties or guarantees payable to Debtor on loss or damage of property, inventions, designs, design registrations, trademarks, trade styles, trade names, know-how, powers, privileges, logos, franchise rights, payments in kind, advertising and promotional materials, trade secrets, patents, patent rights, copyrights, patent applications, tax refunds, customer lists, business and accounting records, including all ledger account cards, computer tapes and disks and other computer information, in all cases whether now owned or hereafter created or acquired by Debtor or in which Debtor may now have or may after the date of this Agreement acquire an interest;

(b)       All inventory, including, without limitation, all goods held for sale or lease, finished goods, merchandise, parts, supplies, raw materials, and work-in-process of every kind and description, and all products thereof, whether now owned or acquired by Debtor after the date of this Agreement, or in which Debtor may now have or may after the date of this Agreement acquire an interest, including, without limitation, inventory temporarily out of Debtor's custody or possession and any returns or repossessions on any sales or accounts;

(c)       All goods, including, without limitation, equipment, machinery, materials, furniture, furnishings, engines, appliances, fixtures, tools, parts, supplies, and vehicles of every kind and description, whether now owned or acquired by Debtor after the date of this Agreement or delivered to the real property of Debtor, or in which Debtor may now have or may after the date of this Agreement acquire an interest, and all additions, accessions, replacements, substitutions, and improvements to such goods and wherever located;

(d)       All documents, documents of title, deposit accounts, negotiable and nonnegotiable instruments, shares, stocks, bonds, debentures, securities, moneys, sources of money, uncalled capital, letters of credit, investment property, and chattel paper whether now owned or acquired after the date of this Agreement by Debtor;

(e)       All instruments, documents, securities, monies, and property in which Debtor has or hereafter acquires rights which now or hereafter are at any time in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Secured Party had conditionally released the same; and

(f)       All proceeds and products of any of the personal property described above, in any form, including, without limitation, proceeds of any insurance relating to such collateral or fire and builder's risk insurance and unrenewed insurance premiums; proceeds consisting of any of the above types of collateral; all awards made in eminent domain proceedings or purchased in lieu of such eminent domain proceedings; proceeds of any noncommercial tort cause of action in existence, now or after the date of this Agreement; and all replacements, substitutions, renewals, returns, additions, accessions, rents, royalties, issues, documents of ownership, and receipts for any of the foregoing.